IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

IN RE:                                          CASE NO. 12-10113 (ESL)

EMPRESAS OMAJEDE INC.                           CHAPTER 11

        Debtor

OPINION AND ORDER

This case is before the court upon Empresas Omajede, Inc.'s (hereinafter referred to as the "Debtor") *Objection to Proof of Claim Number 5 Filed by Banco Popular de Puerto Rico.* The objection hinges on the interpretation of certain contractual clauses regarding the late fees and default rate (or additional late fees) which are included in the three (3) commercial loans that the Debtor has outstanding with Banco Popular de Puerto Rico (hereinafter referred to as "BPPR") (Docket No. 153). The Debtor argues that the late fees may be imposed upon the Debtor after the ten (10) day grace period has lapsed for all three (3) loans, and that the default rate (or additional late fee) is triggered after a payment has been overdue for thirty (30) days, and only applies to the days past due beyond the thirty (30) days. The Debtor further argues that the default rate may only be applied for two (2) of the three (3) loans if the Debtor has been notified of the default in writing. (Docket No. 153).  BPPR filed its *Response to Objection to Claim No. 5* (Docket No. 184).

Subsequently, BPPR filed a *Motion Requesting Partial Summary Judgment and Memorandum of Law in Support of Summary Judgment* as to the issue regarding the contractual interpretation of the penalty clauses for late fees and delinquent interest (referred to as additional late fees in the other 2 loan documents) for late payments pursuant to the loan documents

-1-

(Docket No. 243). BPPR also filed a *Statement of Uncontested Material Facts* regarding the contractual clauses in controversy (Docket No. 244). The Debtor filed its *Motion for Partial Summary Judgment on the Debtor's Objection to Proof of Claim No. 5 Filed by Banco Popular de Puerto Rico* (Docket No. 245). The Debtor filed its *Objection to Proof of Claim Number 5-1 filed by Banco Popular de Puerto Rico* which is based on the same grounds as its prior objection to BPPR's proof of claim but the same includes its objection to attorney's fees since no breakdown is provided (Docket No. 253). BPPR filed its *Response to Debtor's Objection to BPPR's Amended Proof of Claim 5* (Docket No. 5).

For the reasons set forth below this court finds that for all the three (3) loan agreements in controversy only the late fee may be applied after a ten (10) day period. The default interest or additional late fees are not applicable in the instant case as discussed herein. The Debtor's Motion for *Partial Summary Judgment on the Debtor's Objection to Proof of Claim No. 5, Filed By Banco Popular de Puerto Rico* is granted and BPPR's *Motion Requesting Partial Summary Judgment and Memorandum of Law in Support of Summary Judgment* is denied.

## Jurisdiction

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157(b). This is a core proceeding pursuant to 28 U.S.C. §§157(b)(2)(B). Venue is proper under 28 U.S.C. §§1408 and 1409.

## Procedural Background

Empresas Omajede, Inc. filed a bankruptcy petition under Chapter 11 of the Bankruptcy Code on December 21, 2012. The Debtor included BPPR in its Schedule F- Creditors Holding Unsecured Nonpriority Claims- as an unsecured creditor for three (3) different claims in the following amounts: (i) $425,775.09; (ii) $1,498,456.00; and (iii) $1,249,070.00. On March 1, 2013, the Debtor filed a *Motion Submitting Amended Summary of Schedules, Schedules A, B,*

*Amended Schedules D, E, F, Schedules G, H, Statement of Financial Affairs and Amended List of Creditors Holding 20 Largest Unsecured Claims* (Docket No. 34). The Debtor in Schedule A- Real Property listed the following properties: (i) La Electronica Building listed with a current value of $12,000,000 and a secured claim in the amount of $2,747,526; (ii) parking of La Electronica Building listed with a current value of $1,481,477.50 and a secured claim in the amount of $228,633.70; (iii) property #3 Monacillos listed with a current value of $2,275,940 and a secured claim in the amount of $342,950.55; (iv) property #4 Carraizo with a current value of $39,600 and with a secured claim in the amount of $34,062; (v) property #5 Carraizo with a current value of $200,000 and with a secured claim in the amount of $306,558; and (vi) property #6 Carraizo with a current value of $70,400 and a secured claim in the amount of $76,639.51. The Debtor included BPPR in its Schedule D- Creditors Holding Secured Claims- as a secured creditor of the following properties: (i) property #6- Carraizo listed with a value of $70,400. The amount of the claim is in the amount of $76,539.51 of which $6,239.51 is listed as the unsecured portion of the claim; (ii) mortgage on property #4- Carraizo with a listed value of $39,600 and a secured claim in the amount of $34,062; (iii) first mortgage on property #1- La Electronica Building with a listed value of $12,000,000 and a secured claim in the amount of $2,747,526; and (iv) property #5- Carraizo with a listed value of $200,000 and a claim in the amount of $306,558 of which $106,558 is listed as the unsecured portion. The Debtor listed all of BPPR's secured claims as disputed.  On March 11, 2013, the Debtor filed a *Motion Submitting Amended Schedule D and Amended Statement of Financial Affairs* in which it updated the information to include the dates that the secured claims were incurred. The updated information on BPPR's secured claims consists of the following: (i) June 29, 2005, date mortgage was executed on property #6- Carraizo listed with a value of $70,400. The claim is in the amount of $76,639.51, of which $6,239.51 is listed as the unsecured portion of the claim; (ii) June 29, 2005, date mortgage on property #4- Carraizo with a listed value of $39,600 and a secured claim in the amount of $34,062; (iii) June 8, 2006/ March 21, 2003 date(s) of  mortgage on property #1- La

Electronica Building with a listed value of $12,000,000 and a secured claim in the amount of $2,747,526; and (iv) June 29, 2005, date mortgage was incurred on property #5- Carraizo with a listed value of $200,000 and a claim in the amount of $306,558 of which $106,558.00 is listed as the unsecured portion. The Debtor listed all of BPPR's secured claims as disputed (Docket No. 40).

On April 29, 2013, BPPR filed proof of claim #5-1 as a secured claim in the amount of $3,155,331.80, which consists of three (3) loans; namely: (1) loan #9002 with a principal amount of $425,775.09; (2) loan #9003 with a principal amount of $1,490,348.83; and (3) loan #9004 with a principal amount of $1,239,207.88.

On April 3, 2014, the Debtor filed its *Objection to Proof of Claim Number 5 Filed by Banco Popular de Puerto Rico* which is based upon certain contractual clauses contained in the three (3) commercial loans which the Debtor currently has outstanding with BPPR.  The clauses pertain to late fees and additional late fees and when these clauses are triggered.  The Debtor argues that the three (3) loans provide for certain grace periods for payment and that the application of these grace periods is evidenced by Debtor's payment history with the predecessor creditor Westernbank, prior to the transfer of the loans to BPPR. The Debtor argues as follows: (i) Loans 9002, 9003 and 9004 have a ten (10) day grace period during which no penalties are applicable. Ten (10) days after the payment date, there is a late fee which is 5% of the monthly payment. The additional late fee is triggered thirty (30) days after the payment due date and consists of an additional 2% (two percentage points) added to the interest rate until full payment is made of all delinquents amounts owed; (ii) BPPR sent a letter to the Debtor on February 23, 2011 attempting to unilaterally alter the loan contracts. In said letter, BPPR acknowledged that Loans 9002, 9003 and 9004 "contain clauses that go in force during periods of default: one establishes a delinquency charge and the other establishes a default fee." The letter further states that "only the clause relating to the default fee will be in force." Lastly, the letter states that, "[i]t is important to clarify that at Banco Popular the default fee is activated the day following the

-4-

payment due date, and does not include any grace period days. It is deactivated as soon as the payment of the debt is made current, provided that there is no new default event" (Docket No. 153, Exhibit E- certified translation of letter—original letter not submitted); (iii) BPPR unilaterally and contrary to Article 1208 of the Puerto Rico Civil Code, 33 L.P.R.A. §3373, altered the contract terms, thus the Debtor's and BPPR's amortization tables have diverged; and (iv) the interest payments that have been wrongfully accumulated (for the period of August 2010 through February 28, 2014) and adjusted to principal for Loans 9002, 9003 and 9004 amount to $26,622.17, $80,159.52 and $62,195.59, respectively. Loan 9004 became due and payable on June 30, 2010, after this date payments made by Debtor included principal and interest and other times only interest. The Debtor ceased to make payments on this Loan after April 2013 (Docket No. 153, Exhibit I).

On May 5, 2014, BPPR filed a *Motion requesting Extension of Time to File Response* to Debtor's Objection (Docket No. 161) and the court granted the same on May 6, 2014 (Docket No. 162). On May 12, 2014, BPPR filed a second *Motion requesting Extension of Time to File Response* to Debtor's objection to BPPR's proof of claim (Docket No. 167) and the court granted the same on May 13, 2014 (Docket No. 168).

On May 16, 2014, BPPR filed amended proof of claim #5-2 as a secured claim in the amount of $3,172,207.78 which consists of three (3) loans; namely: (1) loan #9002 with a principal amount of $425,775.09; (2) loan #9003 with a principal amount of $1,490,348.83; (3) loan #9004 with a principal amount of $1,239,207.88; (4) attorney's fees in the amount of $12,539; and (5) additional interest in the amount of $4,336.98. The court notes that the supporting documentation for the additional interest is unclear (it appears to be a print out of a computer screen), the listed principal amount is $1,155,429.46 which does not correspond to any of the principal amounts listed for the three (3) loans. Also on that date, BPPR filed a Motion requesting Extension of Time to File Response to Debtor's objection to claim #5-1 (Docket No. 179) and the court *granted the same (Docket No. 183).*

On May 19, 2014, BPPR filed its *Response to Objection to Claim No. 5* arguing that: (i) the objection filed by the Debtor does not contain sufficient evidence to rebut the *prima facie* validity of its proof of claim under Fed. R. Bankr. P. 3001(f); (ii) the Debtor has failed to present sufficient evidence to prove that BPPR has acted contrary to the terms of the loan documents; (iii) for Loans 9002 and 9004, the default rate may be applied once a payment is late from its original due date (or 30 days from the original payment due date according to the Debtor's interpretation which BPPR disputes) and the late fees may be applied once a payment is overdue for at least ten (10) days (from the original due date). For Loan 9003 the late fee and the default rate may be applied if a monthly payment was not received ten (10) days after the payment due date; and (iv) BPPR's assessment of the default rate was correct. The Debtor has consistently made monthly payments between 30-40 days after each payment's due date, thus whether a grace period was applied or not is irrelevant even if a ten (10) day grace period from the payment's due date is calculated. BPPR clarified in footnote 1 of this motion, that it has not assessed the 5% late fee during the term of the loans, nor were these late fees included as part of BPPR's proof of claim, since BPPR assessed the default rate. BPPR stated that it reserved the right to amend its proof of claim to include and assess the late fee(s) if the amounts accrued under the default rate are disallowed (Docket No. 184).

*May 27, 2014 Hearing*

On May 27, 2014, a hearing was held to consider two contested matters; namely, (i) BPPR's objection to plan confirmation and the Debtor's response to BPPR's objection; and (ii) the Debtor's objection to BPPR's proof of claim #5-1 and BPPR's response (Docket No. 195). Debtor's attorney addressed the valuation issue of the Carraizo properties which constitute the collateral for Loan 9002, and stated that pursuant to the 2011 appraisal which was commissioned by BPPR, the Carraizo properties were valued at $310,000.  BPPR commissioned another appraisal as of May 2014 and the market value of the Carraizo properties was $90,000 and the liquidation value was $70,000. There is a legal issue as to whether the court should use the

market or liquidation value for these properties which the Debtor plans to surrender to BPPR.[1] Ms. Loomis further stated that the Debtor would like to present an updated appraisal as to the value of the Carraizo properties. The value of the properties directly affects whether there is a resulting unsecured deficiency which in turn affects the feasibility of the plan. The valuation of the properties is a confirmation issue.

As to the Debtor's objection to claim #5-1, the court stated that the key issue is whether there was a grace period and how this affects the calculation of the late charges, and that it would have to analyze the contract provisions pertinent to the late fees. Thus, the court will need a copy of the contracts to determine whether there is a grace period. The second part is to determine when the payments were done, irrespective of the grace period. The parties need to create an excel spreadsheet for the months in question indicating the date in which the payments were made and/or received. The court indicated that without that spreadsheet, irrespective of the legal issue the court will be unable to determine how much is owed.

BPPR's attorney stated that BPPR had already filed their spreadsheet and what needs to be filed is a supplement for minor payment allegations. The parties agreed that they would exchange the data/spreadsheet (all pertinent documents) for the period in question within seven (7) days, and will then review the data/spreadsheets and provide their conclusions. Thereafter, the court will consider the issue as to the late fees or other amounts owed. Debtor's counsel stated that besides the issue of the application of the late fee clauses, the other issue is the application of the payments to principal or interest. Counsel stated that both parties produced spreadsheets with the loan figures which were submitted to the court but that are vastly different. The Debtor has the payment receipts available and can be produced for the bank.

---

[1] This court in the case of In re Ponce de León 1403, Inc. held that the appropriate valuation methodology to be employed pursuant to 11 U.S.C. §1129(b)(2)(A)(iii) and 506(a) is the bulk value which is also known as the market value to a single purchaser which is a conservative approach to valuation of collateral. See In re Ponce de León 1403, Inc., 523 B.R. 349 (D.P.R. 2014).

The court ordered the parties to exchange the information that they have, try to reconcile the same, and if they cannot reconcile the information the differences need to be explained to the court when the parties submit the information to the court. The parties agreed that within seven (7) days they will exchange the compilation of data including the Debtor's stamped payment receipts. Fourteen (14) days thereafter, parties will file a joint motion of uncontested facts and separate motions stating their respective positions.

As to the second contested matter, the objection to plan confirmation, the court established that there are four (4) key fact areas the parties would need to provide evidence in support of their respective positions; namely: (1) the value of the Carraizo properties (which is comprised of 3 parcels); (2) the factors necessary for establishing a reasonable interest rate for the repayment of the loans; (3) the repayment terms which will include the balloon payment and whether they adjust to market conditions; and (4) feasibility, meaning whether enough income is being generated to cover the operating expenses and to fund the proposed plan.

At this hearing, Mr. Antonio Betancourt, Esq., Debtor's President, testified that throughout the years the Debtor's payment history with the banks has always been good. He further stated that the Debtor has never defaulted with any of the banks that it had done business with throughout the years. He testified that the Debtor had the loans with Westernbank for seven (7) years and that during this period, it never defaulted on the loans. He further testified that after BPPR took over the loans from Westernbank, it did not apply the ten (10) day grace period clauses, rather the 2% late fee penalties are charged the day after the due date. Mr. Betancourt explained that the ten (10) day grace period clauses were negotiated with Westernbank and it was like a mini line of credit.

Mr. Betancourt stated that the Debtor has three (3) loans with Banco Popular. Loans 9003 and 9004 are secured by La Electronica Building. Loan 9002 is secured by the Carraizo properties. The Debtor also has a loan with the Economic Development Bank of Puerto Rico. Mr. Betancourt stated that the Debtor is not making payments for Loan 9002. The interest rate

for Loan 9002 used to be 6.50%. For Loans 9003 and 9004, the interest rate is 1% over the prime rate and the interest rate is set every three (3) years the interest rate. The interest rate for loan 9003 is currently 4.25%. For loan 9004, the interest rate is also prime rate plus 1%, but it has a floor of 4.99% which is the current interest rate. The loan with the Economic Development Bank has an interest rate of 6.50%. Loans 9003 and 9004 both have a twenty (20) year duration, thus they mature in the year 2023 and 2026. The loan which is secured by the Carraizo properties is a five (5) year loan which was due on June 30, 2010.  Banco Popular took over these loans on April 30, 2010, pursuant to a purchase and assumption agreement between the FDIC and Banco Popular.

*Feasibility as a Confirmation Issue*

The court stated that the confirmation hearing will have to be continued to another date to present evidence on the feasibility issue and subsequently schedule a hearing as to the objection to the claim.

BPPR requested the court to make a ruling as to the interest rate and the repayment terms for the loans since they are critical to determine feasibility of the plan. The Debtor stated that an interest rate of 9.25% and a monthly payment of $24,000 would not be feasible. The court declined to make a ruling regarding the interest rate because the court would then have to make a determination upon what was advanced as an argument, that is, whether or not the market rate is applicable. Mr. Soria's testimony was not specifically or by itself on market rate. Mr. Soria's testimony was that the interest rate for this type of loan is the prime rate plus the risk factors as they pertain to a particular client and market. Mr. Soria analyzed the different risk factors for this particular type of loan. The court stated that it was reticent to give a finding without the accompanying conclusion of law which the court would have to elaborate on. The continuation for the confirmation hearing was subsequently scheduled for June 30, 2014.

Subsequently, on June 3, 2014, the court ordered a preliminary pretrial and scheduling conference regarding the Debtor's *Objection to Proof of Claim Number 5* by claimant BPPR

(Docket No. 153) and BPPR's *Response* (Docket No. 184). The same was scheduled for June 30, 2014 (Docket No. 190).

On June 13, 2014, the Debtor filed a motion, *Order Requesting Clarification of Orders of the Court and Requesting Determination of What Will be Considered at the Hearing of June 30, 2014* by which the Debtor requests the court to Order as follows: (i) that the pretrial Order supersedes the verbal Order issued in open court on May 27, 2014; (ii) that evidence will be presented at the June 30, 2014 hearing regarding the value of the Carraizo properties to be able to establish the amount of BPPR's deficiency claim; (iv) determine whether the court will hear evidence on June 30, 2014 as to the legal interpretation of the grace period clauses contained in the loan contracts for loans 9003 and 9004; and (v) grant the Debtor a reasonable period of time to amend its treatment of BPPR's claims under Classes 2 and 4, upon the determination of the amounts owed to BPPR in these classes (Docket No. 199).

On June 23, 2014, the Debtor filed a *Motion Requesting Brief Extension of Time to File Pre-Trial Report* (Docket No. 203) and the same was granted on June 30, 2014 (Docket No. 209). On June 24, 2014 the court ordered the rescheduling of the confirmation hearing to July 28, 2014 to consider: (i) confirmation of plan (Docket No. 124); (ii) pretrial on the objection to claim #5 filed by BPPR; and (iii) all contested matters (Docket No. 204). On June 27, 2014, the Debtor filed a *Motion to Reschedule Hearing Scheduled for July 28, 2014 to August 4, 2014* (Docket No. 206) and the same was granted on June 27, 2014 (Docket No. 207).

On July 21, 2014, the parties filed their *Joint Pre-Trial Report* regarding the interpretation of the loan documents as to the late fees and the default rate (Docket No. 212). On July 28, 2014, BPPR filed an *Urgent Motion Requesting Continuance of the August 4, 2014 Hearing* because its main witness will not be available to testify on the date of the confirmation hearing (Docket No. 213). On July 29, 2014, the Debtor filed its *Response to Urgent Motion to Reschedule Hearing on Confirmation* stating that it did not have an objection to rescheduling the hearing on confirmation. However, the Debtor requested that on said date the court hold a status

conference as to confirmation, a status conference as to the Debtor's objection to the State Insurance Fund's Claim, the pretrial on Debtor's objection to BPPR's claim and an evidentiary hearing as to the value of the Carraizo properties. The Debtor stated that after the evidence offered as to the appropriate interest rate for the modification of BPPR's claim, the Debtor has elected to amend its plan as to BPPR's claims for loans 9003 and 9004. The Debtor's position is that BPPR's claims for loans 9003 and 9004 will be unimpaired because the contractual terms (such as the interest rates, the payment due dates and payment amounts) will remain the same. In addition, the Debtor stated that the determination of the objection to claim and the deficiency on the Carraizo properties needs to be determined prior to plan confirmation. (Docket No. 214).

On July 31, 2014 the court ordered as follows: (1) the hearing on confirmation to be continued without a date; (2) the court will hold a status conference regarding the Debtor's objections to the claim filed by the State Insurance Fund and the motions related thereto; and (3) the court will also hold a pretrial on Debtor's objection to BPPR's claim and the motions related thereto (Docket No. 215).

On August 4, 2014, a status hearing was held to address various issues. The court stated that in the prior hearing it was determined that we would go forward with confirmation and defer the issue of objection to claim #5. After rethinking the issues, in light of the recent memoranda the court stated that the amounts owed need to be determined first given that the plan needs to address the amounts owed to BPPR and then apply the appropriate interest rate applicable under Till. Feasibility may hinge on Debtor's ability to pay BPPR's claim. Moreover, the court indicated that this has several subdivisions which depend on the following: (i) the calculation of the late charges and whether the same were modified by a letter sent to Debtor by BPPR; (ii) allegations that the translation of loan documents may not be accurate; (iii) differences in the translations need to be clarified and submitted to the court; and (iv) the original loan documents and letters have not been filed. Debtor stated that it needs to amend the plan, but it first needs to determine the amount of BPPR's claim under the objection and the resulting deficiency from the

-11-

valuation of the Carraizo properties. As to the reasonable interest rate and repayment terms, Debtor's attorney stated that the Debtor would amend the plan to leave the claim unimpaired, meaning that it will continue with the actual terms. Thus, there would be no cramdown and BPPR would not be entitled to vote. BPPR stated that if the Debtor were to amend the plan, it would still be a contested matter. BPPR's position was that even of BPPR's claim was left unimpaired, BPPR would still be entitled to vote and reject the plan, and thus the cramdown provisions would still be relevant. The court ordered the following: (i) as to the State Insurance Fund claim, the parties have 45 days to either file a settlement agreement or move the court detailing the pending contested issue; (ii) the Debtor has 14 days to file a motion regarding the turnover and valuation of the Carraizo properties and BPPR has 7 days to reply; (iii) the parties have 45 days to file cross motions for summary judgment on the three (3) loans (loan #s 9002, 9003 and 9004) regarding the payment terms in particular the late fees and the default rate; and (v) both parties have fourteen (14) days to file memoranda as to the applicable interest rates under the cramdown provisions under 1129(b) in the case that there is a cramdown. (Docket No. 219).

At this juncture, the court will not address the issue as to the reasonable interest rate and repayment terms for Loans 9003 and 9004, given that the Debtor has stated that it will amend its plan of reorganization to leave the claim unimpaired, meaning that it will continue with the actual contractual terms. BPPR's position was that even if its claim were left unimpaired, it would still be entitled to vote and reject the plan, thus the cramdown provisions would still be relevant (Docket No. 219). The issue the Court will address (resolve) is the legal issue regarding the interpretation and application of the clauses in the loan documents regarding the late fees and the default rate. These contractual clauses are crucial because they are necessary to determine the total amount of the loan indebtedness the Debtor owes BPPR pursuant to these three (3) commercial loans. The two main issues are: (1) whether there is a ten (10) day grace period in which no penalty is applied to payments received within the ten (10) days of the payment date;

and (2) whether the additional late fee (default rate) which consists of an additional two (2) percentage point which is added to the current interest rate on the amounts owed begins accruing from the first day of non-payment (date of default) or whether this clause is triggered after a thirty (30) day grace period the Debtor has to cure the late payment(s) of the loans.

*Position of the Parties as to the Application of the Late Fees and Additional Late Fees*

On October 1, 2014, BPPR filed its *Motion Requesting Summary Judgment and Memorandum of Law in Support of Summary Judgment* arguing as follows: (i) the default rate may be applied pursuant to the loan documents once a payment is late from its original due date for all of the loans and the late fees may be applied once a payment is overdue for at least ten (10) days in loans 9003 and forty (40) days overdue for loans 9002 and 9004. The Debtor submitted English translations of the loan documents as well as the loan documents in the original Spanish language. BPPR noted that it understands that the English translation of the loan documents submitted is not accurate in all aspects and thus, reserves the right to rely in the original Spanish version. (Docket No. 243). [2]The court notes that BPPR did not submit an English translation of the loan documents. BPPR proceeds to analyze the text of the clauses of the commercial loan contracts and the promissory notes to support its position.

*Loan 9003*

Loan 9003 is titled "*Installment Loan Contract*" and the same was executed on June 8, 2006 between Westernbank Puerto Rico (predecessor creditor) and Empresas Omajede, Inc., represented by Mr. Antonio Betancourt Capó. The amount of the principal loaned to the Debtor was $1.8 million with a repayment term of 240 months or 20 years. The interest was fixed for the first 36 months (or 36 monthly payments) at an interest rate of 8.24%, and for the remaining 204 monthly payments, the variable interest rate would be determined at the beginning of this period and it would then be fixed for 36 months. The interest rate would be determined by adding one

---

[2] In order to avoid unnecessary litigation regarding translation, the court will include in footnotes the applicable contract provisions in the Spanish language for ready reference.

basis point (or 1%) to the preferential interest rate established by Citibank N.A., New York. The first repayment term of 36 months at an interest rate of 8.24% began on July 8, 2006 and it would end on June 8, 2009. The monthly payment amount was $15,465.08.

Installment loan contract 9003 consists of nine (9) sections. Clauses E, G, and I of the loan contract are all included under Section 1 of the contract which is titled, "Installment Loan[3]" and provides that:

> "[o]n this date, the Bank has given the Corporation an installment loan of One Million Eight Hundred Thousand Dollars ($1,800,000.00) which is evidenced by a promissory note payable to the Bank certified by affidavit number, 3690 by the Attesting Notary, a copy of which is included as Attachment "A" (hereinafter "Installment Loan"), under the following terms and conditions" (Docket No. 244-4, Exhibit D).

**Clause 1(E)** of the loan contract titled "Interest by Default[4]" provides:

> "[i]n the event of a delinquency in the payment of the principal or interest of the Installment Loan, all of the amounts owed by the Corporation will earn a delinquency interest at the rate resulting from adding two (2) percentage points to the rate agreed to, from the date of the delinquency until full payment of the amounts owed." (Docket No. 244-4, Exhibit D, pg. 3).

**Clause 1(G)** of the loan contract titled "Late Fee[5]" provides:

> "[t]he Corporation shall pay the Bank a late fee equivalent to five percent (5%) of the monthly payment for payments made ten (10) days after the due date of the monthly installment of the Installment Loan." (Docket No. 244-4, Exhibit D, pg. 3).

**Clause 1(I)** of the contract titled "Default[6]" provides:

---

[3] Section 1 of the contract in the Spanish language provides: "1. <u>Préstamo a Plazos</u>. En esta fecha el Banco le ha concedido a la Corporación un préstamo a plazos por la suma principal de Un Millón Ochocientos Mil Dolares ($1,800,000.00) el cual es evidenciado por pagaré a la orden del Banco autenticado por el afidávit número 3,690 del Notario Fedante, copia del cual se uno como Anejo "A" (en adelante "Préstamo a Plazos") bajo los siguientes términos y condiciones" (Docket No. 244-3, Exhibit C).

[4] Clause 1(E) of the contract in the Spanish language provides: "<u>Intereses por Mora</u>. En caso de mora en el pago del principal o el interés del Préstamo a Plazos todas las cantidades adeudadas por la Corporación devengarán intereses de mora a razón del tipo resultante al añadir dos (2) puntos porcentuales al tipo de interés pactado desde la fecha del **incumplimiento hasta el pago** total de las cantidades adeudadas" (Docket No. 244-3, Exhibit C).

[5] Clause G of the contract in the Spanish language provides: "<u>Cargo por Demora</u>. La Corporación pagará al Banco un cargo por **demora** igual al cinco porciento (5%) del pago mensual por pagos efectuados diez (10) días después de la fecha de vencimiento de los plazos mensuales del Préstamo a Plazos." (Docket No. 244-3, Exhibit C).

"[t]he Bank may, at its option, accelerate[] the due date of the unpaid balance of the Installment Loan and proceed to collect it by legal means if any of the following events occurs:

(i) failure to pay the principal and/or interest of any promissory note or obligation by the Corporation on its due date; and/or,

(ii) default by the Corporation of any of the terms and conditions of this contract, or any other obligation with the Bank; and/or,

(iii) if for any reason the Corporation's financial or economic situation deteriorates or changes adversely; and/or,

(iv) a change of control in the Corporation's shareholders without prior notice to the Bank" (Docket No. 244-4, Exhibit D, pgs. 4-5).

Section 2 of the Installment Loan Contract is titled, "Hazardous Substances" and Section 3 is titled, "Obligations and Representations by the Corporation." Section 4 states as follows: "[t]his contract is binding between the parties, their successors, heirs and/or assignees". Section 5 is titled, Notices[7] and provides: "All notice, request or communication that is required under this contract is considered duly made by mailing it to the addresses of the party that are indicated under the respective signatures of this contract."

Section 6 of the Installment Loan Contract is titled, "Limitation[8]" and provides as follows:

---

[6] Clause I of the contract in the Spanish language provides: "**Incumplimiento**. El Banco podrá, a su opción, acelerar el vencimiento del balance insoluto del Préstamo a Plazos y proceder a su cobro por la vía judicial al ocurrir cualesquiera de los siguientes eventos:

(i) falta de pago de principal y/o intereses de cualquier pagaré u obligación por parte de la Corporación en su fecha de vencimiento; y/o,

(ii) incumplimiento por parte de la Corporación con cualesquiera de los términos y condiciones del presente contrato, o cualquier otra obligación para con el Banco; y/o,

(iii) si por cualquier razón la situación financiera o económica de la Corporación se deteriora o cambia adversamente; y/o,

(iv) cambio de control en los accionistas de la Corporación sin previa notificación al Banco" (Docket No. 244-3, Exhibit C).

[7] Section 5 of the contract in the Spanish language provides: "Notificaciones. Toda notificación, requerimientos o comunicación que se requiera bajo el presente contrato se considera debidamente hecha al enviarse por correo a las direcciones de las partes que se indican bajo las respectivas firmas del presente contrato" (Docket No. 244-3, Exhibit C).

[8] Section 6 of the contract in the Spanish language provides: "Limitación. La Corporación no podrá ceder ninguno de sus derechos u obligaciones bajo este contrato sin el previo consentimiento escrito del Banco. La Corporación por la presente reconoce que este préstamo, así como los términos y condiciones del mismo se han concedido en consideración a la persona del deudor así como a la identidad de sus principales accionistas, por lo que reconoce que

"[t]he Corporation may not assign any of its rights or obligations under this contract without the prior written consent of the Bank. The Corporation hereby acknowledges that this loan, as well as the terms and conditions thereof, has been given in consideration of the debtor's person as well as the identity of its main shareholders, and for that reason it acknowledges that in the event of any sale, assignment, transfer, except in the case of a death, to create a lien, give as a guarantee, pledge as security, or in any way transfer the interest of each one onto the debtor; or, in the event of any change in the control of the shareholders, will be equivalent to an event of default which could immediately cause the loan mentioned herein to be declared due and payable, and that will give the Bank all of the remedies that are proper at law, including, but not limited to, accelerating the due date of all of the obligations that the Corporation has with regard to the Bank and using them [to] execute the corresponding guarantees." (Docket No. 244-4, Exhibit D).

Section 7 of the loan contract is titled, "No Assignment[9]" and provides the following: "[t]his contract may not be assigned by the Corporation." Section 8 of the contract is titled, "Amendments[10]" and provides as follows: "[t]his contract may not be altered, amended or novated verbally, and may only be so in writing and executed with the same formalities of this contract. Lastly section 9 of the loan contract, titled, "Expenses[11]" provides: "[a]ll the expenses, costs and attorney fees in regard to this contract shall be borne by the Corporation" (Docket No. 244-4, Exhibit D).

BPPR argues that the Installment Loan contract (loan 9003) does not define the terms "mora" and "demora" and thus, the late fee should be applicable if a monthly payment is

---

en la eventualidad de cualquier venta, cesión, transferencia, excepto en caso de muerte, de crear un gravamen, dar en garantía, pignorar o de cualquier forma enajenar el interés de cada uno en el deudor; o, en la eventualidad de cualquier cambio en control en los accionistas, equivaldrá a un evento de incumplimiento el cual conllevará inmediatamente que se declare por vencido el préstamo aquí relacionado concediendo ello al Banco todos los remedios que en ley procedan, incluyendo, pero sin limitarse a, acelerar el vencimiento de todas las obligaciones que la Corporacion tenga para con el Banco y ejecutar con ello las garantías correspondientes" (Docket No. 244-3, Exhibit C).

[9] Section 7 of the contract in the Spanish language provides: "No Cesión. El presente contrato no podrá ser cedido por la Corporacion" (Docket No. 244-3, Exhibit C).

[10] Section 8 of the contract in the Spanish language provides: "Modificaciones. El presente contrato no podrá ser alterado, modificado o novado verbalmente, solamente lo podrá ser por escrito y otorgado con las mismas formalidades del presente contrato" (Docket No. 244-3, Exhibit C).

[11] Section 9 of the contract in the Spanish language provides: "Gastos. Todos los gastos, costas y honorarios de abogado en relación con el presente contrato serán pagados por la Corporacion" (Docket No. 244-3, Exhibit C).

received after ten (10) days or later from the payment's original due date. The Default rate should be applied whenever a payment is received after the original due date.  BPPR argues that: "[s]pecifically, the credit agreement for Loan 9003 states that the Late Fee (i.e., 'Cargo por Demora') will be assessed after 10 days from the due date of the Loan's monthly installment. The Default Rate, on the other hand, could be applied in the event of any delay in payment from its original due date (i.e., 'en caso de mora')" (Docket No. 243, pg. 8).

The Debtor's position as to the grace period for Loan 9003 is that it has ten (10) days after the due date of the installment without any late fee or penalty pursuant to Section 1(G).  As to the default rate interest penalty, the Debtor argues that sections 1(I), 1(E), and Section 5 need to be read and analyzed together.   The Debtor's analysis regarding the interrelation of these clauses and in comparison to/ contrast to Loan 9004 is as follows:

"Like in Loan 9004, Loan 9003 has a grace period of ten (10) days after the due date of an installment, and a late fee of 5% of the installment amount if paid after the 10th day of the installment due date. However, as compared to Loan 9004, that has clauses defining 'delinquency' as 'a delay of thirty (30) days in the payment corresponding to principal and interest, or principal plus interest,' Loan 9003 does not include such definition of delinquency. Likewise, the default provisions of Loan 9003 do not include the definition of 'default by the debtor' as 'when said payments are due (on the due date or other).' Loan 9003's contract clause refers to 'on its due date' and Loan 9003's promissory note default clause refers to 'Debtor's default in the payment of principal and/or interest thereon or any penalty stipulated to when due.'

Although the default clauses in Loan 9003 do not refer to 'other due date,' by clear inference and intent of the parties to Loan 9003 when the contract is read as a whole— Loan 9003 necessarily includes more than one due date to pay the installment. If the due date for an installment is just one, the day it is due, then the clause in Loan 9003 related to the ten (10) day grace period clause and the late fee of 5% of the installment amount would be rendered null and meaningless." (Docket No. 245, pg. 10-11).

The Debtor also argues that: "the 'due date' in the default clauses in the Loan 9003 contract and its promissory note are general clauses that obviously refer to more than one due date, while the clause in Loan 9003 with the ten (10) day grace period and the late fee penalty of 5% are specific provisions. And again '[i]t is a well-known precept for the interpretation of contracts that specific provisions in a contract trump the general provisions.' [P.R. Tel. Co. v. Sprintcom, Inc., 662 F. 3d 74, 96, (1st Cir. 2011)]. And the Court must avoid any interpretation that would be absurd, commercially unreasonable, or

-17-

contrary to the reasonable expectations of the parties. Oppenheimer & Co. v. Trans Energy, Inc., 946 F. Supp. 2d at 348-49." (Docket No. 245, pg. 11).

The Debtor further argues that: "[t]he duration of the 5% late fee grace period, as well as the 2% default rate in loan 9003 (and loan 9004) is irrelevant because Westernbank/BPPR has never sent the Debtor a notice of default." Loans 9003 and 9004 have a notice clause which requires notice by mailing it to the address of the party. BPPR has never sent the Debtor a notice of default under any of the loans. The Debtor also argues that BPPR's letter dated February 23, 2011 sent by Mr. Eli Sepúlveda is not a notice of default, but "…the bank's unilateral and self-serving erasure of the grace periods and notice clauses, and its rewriting of the clause applying the 2% default rate of interest strictly after the due date."[12]

*Loans 9004 and 9002*

The contractual clauses of loans 9004 and 9002 will be discussed together because the loan contracts are very similar (similar loan contract template), meaning that they are both comprised of the same articles and sections, albeit there are some minor differences.

Loan 9004 is titled "Loan Contract" and the same was executed on March 21, 2003 between Westernbank Puerto Rico (predecessor creditor) and Empresas Omajede, Inc. whose representative was Mrs. Olga Capó Betancourt. The amount of the principal loaned to the Debtor was $1.8 million with a repayment term of 240 months or 20 years. The interest for this type of loan was fixed for the first 12 months at an interest rate of 3.99% with a monthly payment of $10,953.02 commencing on April 21, 2003, and for the remaining 228 monthly payments, the interest rate would be determined every 36 months with the first period commencing on April 21, 2004. The interest rate determined cannot be less than the result of adding one basis point (or 1% / one percentage point) to the annual 3.99% minimum base and

---

[12] The court will not consider whether the letter sent by BPPR constitutes an amendment to the loan contracts because BPPR has not argued this particular point. BPPR's arguments regarding the interpretation of the grace period, late fees and the default rate are based on the loan documents.

-18-

cannot be greater than the result of adding one basis point (or 1%-one percentage point) to the annual 8.99% maximum base. The interest rate determined for every 36 month period is a fixed rate.

Loan 9002 is titled Loan Contract and the same was executed on June 29, 2005 between Westernbank Puerto Rico (the predecessor creditor) and Empresas Omajede, Inc., represented by Mr. Antonio Betancourt Capó. The amount of the principal loaned to the Debtor was $455,000.00 with a term of five (5) years and a repayment term of thirty (30) years. The interest for this type of loan is fixed for the first five (5) years at an interest rate of 6.50%, with a monthly payment of $2,904.39, and a final balloon payment for the principal balance owed plus interest at the agreed rate.

Both loan contracts, 9004 and 9002, consist of nine (9) articles. Article I includes the definitions of certain terms. Section 1.01[13] titled, "Definitions" provides: "[a]s used in this Contract the following words and terms shall have the respective meanings that are listed below, except when the contexts in which they are used indicate otherwise" (Docket No. 244-6, 244-8 Exhibits F & H). Amongst the defined terms[14] included, the following are important for our analysis:

---

[13] Section 1.01 in the Spanish language states: "Según se utilizan en este Contrato las siguientes palabras y términos tendrán los respectivos significados que se detallan en adelante, excepto cuando el contexto en que se utilicen indique lo contrario." (Docket No. 244-5, 244-7, Exhibits E & G).

[14] The defined terms in the Spanish language are as follows:

"*Documentos de Préstamo*- querrá decir este Contrato, el Pagaré, las Garantías y todos y cualquier otro documento emitido u otorgado relacionado al Préstamo"

"***Morosidad***- retraso de treinta (30) días en el pago mensual correspondiente a principal e intereses, o principal más intereses"

"*Tasa de Interés Aplicable*- querrá decir las tasas de interés devengadas por el Préstamo bajo el Contrato."

"*Tasa Primaria*- querrá decir la tasa de interés prevaleciente de tiempo en tiempo por el Citibank en la ciudad de Nueva York, para préstamos comerciales, según publicado en periódicos de circulación general como "The Wall Street Journal." Disponiéndose que de publicarse más de una de dichas tasas en la misma fecha, prevalecerá de éstas para efectos del Contrato la publicada por el Citibank de Nueva York la cual legalmente pueda cargarse al Deudor de conformidad con las leyes y reglamentos que le sean aplicables. Los cambios periódicos en la tasa de interés serán efectivos a partir de la fecha de efectividad de cualquier cambio en la Tasa Primaria sujeto a la reglamentación aplicable." (**Loan 9004**-Docket No. 244-5, Exhibit E).

"Loan Documents- will mean this Contract, the Promissory Note, the Guarantees and each and every other document issued or executed relating to the Loan."

"Delinquency- a delay of thirty (30) days in the monthly payment corresponding to the principal and interest, or principal plus interest."

"Applicable Interest Rate"- will mean the interest rates earned by the Loan under this Contract."

"Prime Rate"- will mean the prevailing interest rate from time to time by Citibank in the city of New York, for commercial loans, as published in newspapers of general circulation such as The Wall Street Journal. It being provided that if more than one of said rates is published on the same date, for the effects of the Contract, the one published by Citibank New York shall prevail, which legally may be charged to the Debtor in accordance with the laws and regulations that may be applicable. Periodic changes in the interest rates shall be effective starting on the effective date of any change in the Prime Rate subject to the applicable regulation." (**Loan 9004**- Docket No. 244-6, Exhibits F)

"Prime Rate- will mean the prevailing interest rate from time to time at the main banks in New York City, for commercial loans, as published in newspapers of general circulation such as The Wall Street Journal. It being provided that if more than one of said rates is published on the same date, what will prevail for the effects of the Contract will be the highest one of these that can legally be charged to the Debtor, in accordance with the laws and regulations that may be applicable. Periodic changes in the interest rates shall be effective starting on the effective date of any change in the Prime Rate subject to the applicable regulation" (**Loan 9002**- Docket No. 244-8, Exhibit H).

"Annual Review- The Bank will review all the terms and conditions established in the contract together with the required documentation, such as recent Financial Statements, CRIM, Insurance and any other document required by the Bank to ensure compliance. A review does not involve changes in the terms and conditions provided that there has been no default of the agreement." (Docket No. 244-6, 244-8 Exhibits F & H).

---

"Tasa Primaria- querrá decir la tasa de interés prevaleciente de tiempo en tiempo en los principales bancos de la Cuidad de Nueva York, para préstamos comerciales, según publicado en periódicos de circulación general como "The Wall Street Journal." Disponiéndose que de publicarse más de una de dichas tasas en la misma fecha, prevalecerá de éstas para efectos del Contrato la más alta que legalmente pueda cargarse al Deudor de conformidad con las leyes y reglamentos que le sean aplicables. Los cambios periódicos en la tasa de interés serán efectivos a partir de la fecha de efectividad de cualquier cambio en la Tasa Primaria sujeto a la reglamentación aplicable." (**Loan 9002**-Docket No. 244-7, Exhibit H).

"*Revisión Anual*- El Banco repasará todos los términos y condiciones establecidos en el contrato junto a la documentación requerida, entiéndase Estado Financiero recientes, CRIM, Seguros y algún otro documento requerido por el Banco, para asegurarse del cumplimiento. Una revisión no implicará cambios en los términos y condiciones siempre que no haya incumplimiento en los acuerdos." (Docket No. 244-5, 244-7, Exhibits E & H)

Article II is titled, "Representations and Warranties" and consists of a list of the guaranties of the debtor under these particular loan contracts.

Article III is titled, "Loans" and provides the following terms for **loan 9004**:

"**Section 3.01** Loan Commitment. The Bank hereby agrees, subject to the terms and conditions of this Contract, to grant to Debtor, a loan in the principal amount of One Million Eight Hundred Thousand Dollars ($1,800,000.00) for the term of twenty (20) years.

**Section 3.02** Loan Conditions[15].

    a. The loan made in accordance with Section 3.01 above shall be evidenced by the Promissory Note, in a manner and substance acceptable to the Bank and dated

---

[15] Section 3.02 of the Loan Contract in the original Spanish language is as follows:

"**Sección 3.02** Condiciones del Préstamo.

    a. El Préstamo hecho de acuerdo con la anterior Sección 3.01, será evidenciado por el Pagaré, de forma y substancia aceptable al Banco y fechado con la fecha del Préstamo, pagadero a la orden del Banco y conforme a los términos que se detallan adelante.

    b. La Tasa de Interés Aplicable será una tasa de interés al Tres Punto Noventa y Nueve Por Ciento (3.99%) Anual por el término de Doce (12) Meses.

    c. La suma principal del Préstamo será pagadera como sigue:

        (i) doce (12) plazos mensuales consecutivos de $10,953.02 cada uno de principal e intereses a razón del tres punto noventa y nueve porciento (3.99%) anual, comenzado el día 21 de abril de 2003; y,

        (ii) comenzando el día 21 de abril de 204, 228 plazos mensuales consecutivos de principal e intereses computados al tipo fijo igual al resultante al añadir un punto porcentual (1%) a la tasa de interés preferencial establecida de cuando en cuando por el Citibank of New York ("Base") en la fecha de comienzo de cada período de Treinta y Seis (36) plazos consecutivos y del período final si fuera menor de treinta y seis (36) plazos (período final). El tipo de interés a pagarse será fijo durante estos períodos consecutivos de treintiseis (36) plazos y del período final. El importe de los plazos de principal e intereses se computará al comienzo de cada período de treintiseis (36) plazos y del período final dividiendo el balance insoluto del principal con intereses al tipo resultante pactado entre el número de plazos restantes hasta el vencimiento total.

        Repago a efectuarse con los ingresos recibidos y generados por la corporación. El principal e interés del Pagaré será pagadero a la orden del Westernbank Puerto Rico en la fecha de vencimiento, cualquiera que esta sea, en fondos de obtención inmediata y en moneda legal de los Estados Unidos de América, en la dirección provista bajo su firma en este documento o en cualquiera otra que el Banco especifique por escrito al Deudor.

    d. No obstante cualquier cláusula en este Contrato, la obligación del Deudor bajo este Contrato y el Pagaré están sujetas a la limitación de que el pago de intereses no será requerido en tanto en cuanto, el recibo todo o parte de dicho pago por parte del Banco resultare contrario a las leyes aplicables al Banco, que limitan la tasa máxima de interés que puede ser cobrada por el Banco." (Docket No. 244-5, Exhibit E).

with the date of the Loan, payable to the order of the Bank and pursuant to the terms that are listed below.

b. The Applicable Interest Rate shall be an interest rate of Three Point Ninety-Nine Percent (3.99%) Per Annum for the term of Twelve Months.

c. The principal amount of the Loan shall be payable as follows:

(i)     Twelve (12) consecutive monthly installments of $10,953.02 each one with principal and interest at the rate of three point ninety-nine percent (3.99%) per annum, beginning on April 21, 2003; and,

(ii)    Beginning on April 21, 2004, 228 consecutive monthly installments of principal and interest computed at the fixed rate equivalent of the result of adding one percentage point (1%) to the preferred interest rate established from time to time by Citibank of New York ("Base") on the beginning of each date of each period of  Thirty-Six (36) installments (final period). The interest rate to be paid in each successive period of thirty-six (36) months shall not be less than the result of adding one percentage point (1%) to the three point ninety-nine percent (3.99%) per annum ("Minimum Base") nor greater than that of adding a percentage point to the eight point ninety-nine percent (8.99%) per annum ("Maximum Base"). The interest rate to be paid shall be fixed during these consecutive periods of thirty-six (36) installments and (during) the final period. The amount of the installments of principal and interest shall be computed at the beginning of each period of thirty-six (36) installments and (beginning) of the final period dividing the unpaid balance of principal, with interest at the resulting agreed upon, by the number of remaining installments until completely paid.
Repayment to be made with the income generated by the corporation. The principal and interest of the Promissory Note shall be payable to the order of Westernbank Puerto Rico on the due date whatever it may be, in funds that are immediately available and in legal tender of the United States of America, at the address provided under its signature on this document or at any other place that the Bank specifies to the Debtor in writing.

d. Notwithstanding any clause in this Contract, the Debtor's obligation under this Contract and the Promissory Note are subject to the limitation that the payment of interest shall not be required insofar as, the receipt of all or part of said payment by the Bank results contrary to the applicable laws of the Bank, that limit the maximum interest rate that may be charged by the Bank." (Docket No. 244-6, Exhibit F).

Article III is titled, "Loans" and provides the following terms for **loan 9002**:

"**Section 3.01** <u>Loan Commitment.</u>  The Bank hereby agrees, subject to the terms and conditions of this Contract, to give the Debtor, a loan in the principal amount of Four Hundred Fifty-Five Thousand Dollars ($455,000.00) for the term of five (5) years, with a repayment of thirty (30) years.

**Section 3.02** <u>Loan Conditions</u>[16].

   a. The loan made in accordance with Section 3.01 above shall be evidenced by the Promissory Note, in a manner and substance acceptable to the Bank and dated with the date of the Loan, payable to the order of the Bank and pursuant to the terms that are listed below.

   b. The Applicable Interest Rate shall be an interest rate of Six Point Fifty Percent (6.50%) Per Annum for the term of Five (5) Years with repayments of thirty (30) years.

   c. The principal amount of the Loan shall be payable in fifty-nine (59) consecutive monthly payments of $2,904.39 of principal and interest, and a final balloon payment for the balance of the principal owed plus interest at the agreed rate. Sporadic payments on the principal balance owed will be made. The repayment to be made with the income derived from the rental of spaces located in the Edificio La Electronica in Rio Piedras, Puerto Rico.

---

[16] Section 3.02 of the Loan Contract in the original Spanish language is as follows:

"**Sección 3.02** <u>Condiciones del Préstamo</u>.

   a. El Préstamo hecho de acuerdo con la anterior Sección 3.01, será evidenciado por el Pagaré, de forma y substancia aceptable al Banco y fechado con la fecha del Préstamo, pagadero a la orden del Banco y conforme a los términos que se detallan adelante.

   b. La Tasa de Interés Aplicable será una tasa de interés al Seis Punto Cincuenta Por Ciento (6.50%) Anual por el término de Cinco (5) Años con repagos de treinta (30) años.

   c. La suma principal del Préstamo será pagadera en cincuentinueve (59) mensualidades consecutivas de $2,904.39 de principal e intereses, y un pago final englobado por el balance de principal adeudado más interés al tipo pactado. Se realizarán abonos esporádicos al balance de principal adeudado. Repago a efectuarse con los ingresos provenientes de la renta de espacios ubicados en el Edificio La Electrónica, en Río Piedras, Puerto Rico.

El principal e interés del Pagaré será pagadero a la orden del Westernbank Puerto Rico en la fecha de vencimiento, cualquiera que esta sea, en fondos de obtención inmediata y en moneda legal de los Estados Unidos de América, en la dirección provista bajo su firma en este documento o en cualquiera otra que el Banco especifique por escrito al Deudor.

   d. No obstante cualquier cláusula en este Contrato, la obligación del Deudor bajo este Contrato y el Pagaré están sujetas a la limitación de que el pago de intereses no será requerido en tanto en cuanto, el recibo todo o parte de dicho pago por parte del Banco resultare contrario a las leyes aplicables al Banco, que limitan la tasa máxima de interés que puede ser cobrada por el Banco." (Docket No. 244-7, Exhibit H).

The principal and interest of the Promissory Note shall be payable to the order of Westernbank Puerto Rico on the due date, whatever it may be, in funds that are immediately available and in legal tender of the United States of America, at the address provided under its signature on this document or at any other place that the Bank specifies to the Debtor in writing.

d.   Notwithstanding any clause in this Contract, the Debtor's obligations under this Contract and the Promissory Note are subject to the limitation that the payment of interest shall not be required insofar as the receipt of all or part of said payment by the Bank turns out to be counter to the laws applicable to the Bank that limit the maximum interest rate that may be charged by the Bank."  (Docket No. 244-8, Exhibit H).

Article IV of both Loan Contracts is titled, "Default" and Section 4.01 of said Article lists the events that constitute default events. Amongst the default events listed[17], the following are of interest in this particular case:

---

[17] The particular default events in the original Spanish language state as follows:

"a. Incumplimiento por el Deudor en el pago del principal, o en el pago de los intereses sobre el Pagaré cuando dichos pagos sean pagaderos (a la fecha de vencimiento u otra);

c.   El Deudor sea declarado insolvente o quebrado, o admita por escrito su incapacidad para pagar sus deudas según estás venzan o haga una cesión de sus bienes para beneficio de los acreedores o el Deudor solicite o consienta al nombramiento de un custodio, síndico u oficial similar para la totalidad o cualquier parte substancial de su propiedad; o el Deudor constituya (por petición, solicitud, contestación, consentimiento o de otra forma), cualquier procedimiento de quiebra, insolvencia, composición, reorganización, arreglo, reajuste de deudas, o cualquier otro procedimiento similar bajo las leyes de cualquier jurisdicción; o que cualquier sentencia, orden, embargo, providencia judicial o administrativa, o cuestión similar no sea dejada sin efecto, cancelada o afianzada dentro de los treinta (30) días de ser emitida o impuesta;

d.  Incumplimiento o violación por parte del Deudor de cualquiera de los términos, acuerdos, cláusulas o condiciones de su parte, en sus aspectos materiales incluidos en este Contrato, los otros Documentos del Préstamo y/o cualquier otro acuerdo, contrato o instrumento con el Banco;

h.  El Deudor tendrá un periodo de diez (10) días calendarios para subsanar cualquiera de las situaciones contenidas en los párrafos que anteceden, por lo cual el Banco no podrá solicitar efecto de incumplimiento hasta pasado los diez (10) días calendario. (Docket No. 244-6, Exhibit F, 244-8, Exhibit H).

i.  **"Intereses en caso de incumplimiento: En caso de incumplimiento, de parte de los deudores, de los términos del presente contrato, a partir de la fecha de envío de la notificación a los deudores por el Banco o el tenedor del pagaré entregado en garantía, éste comenzará a devengar intereses sobre el balance pendiente de pago al tipo de interés preferencial al añadir dos (2) puntos porcentuales a la tasa de interés preferente establecida en el préstamo a la fecha de notificación antes referida."** (**Loan 9004**-Docket No. 244-5, Exhibit E).

"a. Default by the Debtor in the payment or principal, or in the payment of the interest on the Promissory Note when said payments are due (on a due date or other);

c. The Debtor is found to be insolvent or bankrupt, or has admitted in writing that he is incapable of paying his debts as these come due or makes an assignment of his property to the benefit of the creditors, or the Debtor requests or consents to the appointing of a guardian, receiver or similar officer for the entirety or any substantial part of his property; or the Debtor constitutes (by petition, request, answer, consent or otherwise) any bankrupt proceeding, insolvency, composition, reorganization, arrangement, readjustment of debts, or any other similar proceeding under the laws of any jurisdiction; or that any judgment, order, attachment, legal or administrative decision, or similar item is issued against any of Debtor's property and said judgment,

j. **"Intereses en caso de incumplimiento: En caso de incumplimiento, de parte de los deudores, de los términos del presente contrato, a partir de la fecha de envío de la notificación a los deudores por el Banco o el tenedor del pagaré entregado en garantía, éste comenzará a devengar intereses sobre el balance pendiente de pago al tipo de interés preferencial al añadir dos (2) puntos porcentuales a la tasa de interés preferente establecida en el préstamo a la fecha de la notificación antes referida."** (**Loan 9002**- Docket No. 244-7, Exhibit G).

"En caso de un Evento de Incumplimiento descrito en la Sección 4.01(c), el compromiso del Banco se terminará y/o el principal de y cualquier interés acumulado sobre el Pagaré y todas las demás obligaciones del Deudor bajo este documento, se convertirán en líquidas y exigibles automáticamente, sin ninguna acción de parte del Banco, sin notificación al Deudor, o a ninguna otra persona, sin protesto, presentación, demanda o aviso, todos los cuales se renuncian expresamente; en el caso de cualquier otro Evento de Incumplimiento, el Banco mediante notificación escrita al Deudor (a) podrá inmediatamente dar por terminado el compromiso del Banco y/o (b) declarar vencido el principal de cualquier interés acumulado sobre el Pagaré, así también serán líquidas y exigibles todas las obligaciones del Deudor, sin necesidad de aviso, protesto, representación y/o demanda, todos los cuales se renuncian expresamente; en el caso de cualquier otro Evento de Incumplimiento, el Banco mediante notificación escrita el Deudor (a) podrá inmediatamente dar por terminado el compromiso del Banco y/o (b) declarar vencido el principal de cualquier interés acumulado sobre el Pagaré, así también serán líquidas y exigibles todas las obligaciones del Deudor, sin necesidad de aviso, protesto, representación y/o demanda, todos los cuales se renuncian expresamente." (**Loan 9004**-Docket No. 244-5, Exhibit E).

"En caso de un Evento de Incumplimiento descrito en la Sección 4.01(c), el compromiso del Banco se terminará y/o el principal de y cualquier interés acumulado sobre el Pagaré y todas las demás obligaciones del Deudor bajo este documento, se convertirán en líquidas y exigibles automáticamente, sin ninguna acción de parte del Banco, sin notificación al Deudor, o a ninguna otra persona, sin protesto, presentación, demanda o aviso, todos los cuales se renuncian expresamente; en el caso de cualquier otro Evento de Incumplimiento, el Banco mediante notificación escrita al Deudor (a) podrá inmediatamente dar por terminado el compromiso del Banco y/o (b) declarar vencido el principal de cualquier interés acumulado sobre el Pagaré, así también serán líquidas y exigibles todas las obligaciones del Deudor, sin necesidad de aviso, protesto, representación y/o demanda, todos los cuales se renuncian expresamente; en el caso de cualquier otro Evento de Incumplimiento, el Banco mediante notificación escrita el Deudor (a) podrá inmediatamente dar por terminado el compromiso del Banco y/o (b) declarar vencido el principal de cualquier interés acumulado sobre el Pagaré, así también serán líquidas y exigibles todas las obligaciones del Deudor, sin necesidad de aviso, protesto, representación y/o demanda, todos los cuales se renuncian expresamente." (Docket No. 244-5, Exhibit E, Docket No. 244-7, Exhibit G).

order, attachment, legal or administrative decision, or similar item is not set aside, cancelled or bonded within (30) days of it being issued or imposed;

d.  Default or violation on behalf of Debtor of any of the terms, agreements, clauses or conditions on its part, in their material aspects included in this Contract, the other Loan Documents and/or any other agreement, contract or instrument with the Bank;

h.   The Debtor will have a period of ten (10) calendar days to cure any of the situations contained in the preceding paragraphs, and for that reason, the Bank may not request the effect of default until the ten (10) calendar days have elapsed." (Docket No. 244-6, Exhibit F, 244-8, Exhibit H).

"i.  **Interest in the event of default:  In the event of default, on behalf of the debtors, under the terms of this contract, starting from the date of sending the notice to the debtors by the Bank or by the holder of the promissory note given as guarantee, the latter shall begin to earn interest on the unpaid balance at the *preferred rate* by adding two (2) percentage points to the prime interest rate established in the loan on the date of the notice previously mentioned"** (**Loan 9004**-Docket No. 244-6, Exhibit F).

"i.   **Interest in the event of a default:  In the event of default, on behalf of the debtors, under the terms of this contract, starting from the date of sending the notice to the debtors by the Bank or by the holder of the promissory note given as guarantee, the latter shall begin to earn interest on the unpaid balance at the preferred rate by adding two (2) percentage points to the *prime interest rate* established in the loan on the date of the notice previously mentioned"** (**Loan 9002**-Docket No. 244-8, Exhibit H).

"In case of a Default Event as described in Section 4.01(c), the commitment of the Bank shall be terminated and/or the principal of and any interest accrued on the Promissory Note and all the other obligations of the Debtor under this document, become due and payable, automatically, without any action on behalf of the Bank, without notifying the Debtor or any other person, without protest, presentment, demand, or notice, all of which are expressly waived; in case of any Default Event, the Bank, by written notice given to the Debtor (a) may immediately terminate the Bank's commitment and/or (b) declare the principal of any accrued interest on the Promissory Note to be due, as well as all the Debtor's obligations due and payable, without the need for notice, protest, representation and/or demand, all of which are expressly waived; in case of any other Default Event, the Bank through written notice given to the Debtor (a) may immediately terminate the Bank's commitment and/or (b) declare the principal of any accrued interest on the Promissory Note to be due, as well as all the Debtor's obligations due and payable, without the need for notice, protest, representation and/or demand, all of which are expressly waived." (**Loan 9004**-Docket No. 244-6, Exhibit F, **Loan 9002**- Docket No. 244-8, Exhibit H).

Article V of both Loan Contracts is titled, "Prior Conditions" which states that the Bank will not be required to make the Loan unless it has received from the Debtor before the closing date all of the documents that guarantee the obligation, such as the mortgage promissory note and the pledge contract. Article VI of both Loan Contracts is titled, "Stipulations" and the same includes the affirmative and negative stipulations to which the Debtor abides pursuant to this Loan Contract.

Article VII for both Loan Contracts does not have a title. The same consists of four (4) sections[18] which provide the following:

---

[18] The four sections of Article VII in the Spanish language read as follows:

"**Sección 7.01** Remedios en General.  Siempre que ocurra o continúe ocurriendo uno o más de los eventos especificados en la Sección 4.01 de este documento, o el Deudor incumpla en el pago principal o interés sobre el Pagaré cuando éste venza y sea pagadero, el Banco podrá tomar una o más de las siguientes medidas remediales, respetando lo contenido y contemplado en el párrafo "h" de la Sección 4.01:

    a. Tomar cualquier acción de ley o equidad que pueda parecer necesaria o conveniente para cobrar las cantidades vencidas o por vencer del Pagaré o para hacer cumplir cualquiera de las obligaciones, acuerdos o compromisos del Deudor bajo este Contrato, el Pagaré, o los Documentos de Préstamo o cualquier otro documento contemplado, y/o mencionados en este o aquellos documentos; y/o" (Docket No. 244-5, Exhibit E, 244-7, Exhibit G).

    b. Declarar vencidos, líquidos y exigibles, el balance de principal del Préstamo, los pagarés y cualquier interés acumulado y no pagado, y cualquier otra cantidad a la cual el Deudor se haya obligado, **sin necesidad de aviso**, requerimiento previo, demanda, presentación o protesto, **todos los cuales se renuncian expresamente** y el Banco podrá iniciar inmediatamente los procedimientos para el cobro de los mismos. (**Loan 9004**- Docket No. 244-5, Exhibit E).

    b. Declarar vencidos, líquidos y exigibles, el balance de principal del Préstamo, los pagarés y cualquier interés acumulado y no pagado, y cualquier otra cantidad a la cual el Deudor se haya obligado, **con necesidad de aviso**, requerimiento previo, demanda, presentación o protesto, **todos los cuales se renuncian expresamente** y el Banco podrá iniciar inmediatamente los procedimientos para el cobro de los mismos. (**Loan 9002**- Docket No. 244-7, Exhibit G).

"**Sección 7.02** Remedios Acumulativos. Los remedios y derechos concedidos a o reservados para el Banco no se considerarán exclusivos de cualquier otro remedio o remedios disponibles; todos y cada uno de dichos remedios serán acumulativos y concurrentes y serán en adición a cualquier otro remedio especificado en este Contrato o existente en ley, equidad o estatutariamente. Cualquier demora u omisión en el ejercicio de cualquier derecho o acción proveniente de incumplimiento, o la omisión  del Banco de insistir en el cumplimiento estricto de cualquiera de los acuerdos y compromisos que se detallan en este

"**Section 7.01** Remedies in General. Whenever there is an occurrence or a continuing occurrence of one or more of the events specified in Section 4.01 of this document, or the Debtor defaults on the payment of the principal or interest on the Promissory Note when it is due and payable, the Bank may take one or more of the following remedy measures, respecting the content and what is contemplated in paragraph "h" of Section 4.01:

a. Take any action at law or in equity that may seem to be necessary or proper to collect the amounts due or to come due from the Promissory Note, or to enforce any of the Debtor's obligations, agreements or commitments under this Contract, the Promissory Note or the Loan Documents or any other document contemplated and/or mentioned in this or those documents; and/or" (Docket No. 244-6, Exhibit F, 244-8, Exhibit H).

b. "Declare as owed, due and payable the principal balance of the Loan, the promissory notes and any accrued and unpaid interest, and any other amount to which Debtor has been obligated, **without need for any notice**, prior request, demand, presentment or protest, **all of which are expressly waived** and the Bank may immediately initiate any proceedings for the collection thereof." (**Loan 9004**- Docket No. 244-6, Exhibit F).

b. "Declare as owed, due and payable the principal balance of the Loan, the promissory notes and any accrued and unpaid interest, and any other amount to which Debtor has been obligated, **with need for any notice**, prior request, demand, presentment or protest, **all of which are expressly waived** and the Bank may immediately initiate any proceedings for the collection thereof." (**Loan 9002**- Docket No. 244-8, Exhibit H).

contrato, o a ejercitar cualquier derecho y/o remedio en caso de incumplimiento por el Deudor, no afectará ninguno de los antedichos derechos o acciones, no se considerarán o se tendrán por renuncia o relevo de los derechos a insistir o hacer cumplir por interdicto o cualquier otro remedio apropiado, en ley o equidad, cumplimiento estricto por el Deudor con todos los compromisos, acuerdos y condiciones aquí contenidas, o con el derecho a ejercer cualquiera de dichos derechos o remedios si se repitiera el incumplimiento por parte del Deudor.

**Sección 7.03** Notificación no es Necesaria. Para que el Banco pueda ejercer cualquiera de sus remedios disponibles, no será necesaria notificación a aviso alguno, en adición a aquellas que se especifican en este Contrato.

**Sección 7.04** Renuncias. En caso de que cualquier compromiso o acuerdo incluido en este Contrato o en el Pagaré sea violado por cualquiera de las partes y sea relevado, cuyo relevo se hará por escrito por la otra parte, o cualquier relevo de cualquier acuerdo o compromiso incluido en este Contrato o en el Pagaré, cuyo relevo se hará por escrito por la parte afectada, limitará a esa violación o evento en particular en el cual se relevó de cumplimiento y no considerará, bajo ninguna circunstancia, un relevo de cumplimiento en cualquier otro evento." (Docket No. 244-5, Exhibit E, 244-7, Exhibit G).

-28-

"**Section 7.02** Accumulative Remedies. The remedies and rights granted to or reserved for the Bank shall not be considered exclusive of any other remedy or remedies available; each and every one of said remedies shall be accumulative and concurrent, and shall be in addition to any other remedy specified in this Contract or existing at law, in equity or statutorily. Any delay or omission in exercising any right or action stemming from the default, or the omission by the Bank in insisting on strict performance of any of the agreements and commitments that are listed in this contract, or exercise any right and/or remedy in the event of a default by Debtor, shall not affect any of the above-mentioned rights or actions, shall not be considered or deemed a waiver or release of the rights to insist or enforce by injunction, or any other appropriate remedy at law or in equity, strict performance by the Debtor of all the commitments, agreements and conditions contained herein, or with the right to exercise any of said rights or remedies if the default on behalf of the Debtor is repeated.

**Section 7.03** Notice is not Necessary. For the Bank to be able to exercise any of its available remedies, it shall not be necessary to give notice or advisement whatsoever, in addition to those that are specified in this Contract.

**Section 7.04** Waivers. In the event that any commitment or agreement included in this Contract or in the Promissory Note is violated by any of the parties and is released, such release shall be made in writing by the other party, or any release from any agreement or commitment included in this Contract, or in the Promissory Note which release shall be made in writing by the affected party, shall be limited to that violation or particular event in which compliance was released and shall not be considered, under any circumstance, a release from compliance with any other event." (Docket No. 244-6, Exhibit F, 244-8, Exhibit H).

Article VIII[19] for both Loan Contracts provides as follows:

---

[19] Article VIII in the Spanish language provides:

"**Cargos por Demora**: Por cada plazo mensual que esté en morosidad por más de diez (10) días, los Deudores pagarán un cargo de un cinco porciento (5%) del importe del pago vencido." (Docket No. 244-5, Exhibit E, 244-7, Exhibit G).

"**Pagos por Adelantado**: En caso de que el Deudor saldara por adelantado esta obligación con fondos propios, no se cobrará penalidad alguna por prepago." (**Loan 9002**- Docket No. 244-7, Exhibit G).

**"Cargos Adicional por Demora**:  En caso de **mora en el pago de principal o el interés** de esta obligación todas las cantidades adeudadas devengarán intereses de **mora** a razón del tipo resultante al añadir dos (2) puntos porcentuales al tipo de interés pactado en este contrato **desde la fecha del incumplimiento hasta el pago total de las cantidades adeudadas. El Deudor reconoce que esta penalidad es en adición a los cargos por demora establecidos por el Banco para todo pago efectuado luego de transcurrido diez (10) días desde su vencimiento.**

**Indemnificación**: El Deudor acuerda defender, indemnificar y liberar de toda responsabilidad al Banco de cualquier y toda reclamación, daño, sentencia, penalidad, costo y gasto (incluyendo aquellos gastos y

-29-

"**Late Fees**: For each monthly installment that is delinquent for more than ten (10) days, the Debtors shall pay a charge of five per cent (5%) of the amount of the payment due." (Docket No. 244-6, Exhibit F, 244-8, Exhibit H).

"**Payments in Advance**: In case the Debtor pays this obligation in advance with his own funds, he will not be charged any prepayment penalty whatsoever." (**Loan 9002**-Docket No. 244-8, Exhibit H).

"**Additional Late Fees**: In the event of a delinquency in the payment of the principal or interest of this obligation, all amounts due shall bear delinquent interest at the rate resulting from adding two (2) percentage points to the interest rate agreed to in this contract from the date of default until full payment of the amounts owed. The Debtor acknowledges that this penalty is in addition to the late fees established by the Bank for all payments made after ten (10) days from its due date.

**Indemnity:** The Debtor agrees to defend, indemnify and release the Bank from all liability from any and all claim, damage, judgment, penalty, cost and expense (including those expenses and attorney fees that may result due to the fact that the Bank has resorted to its rights under this clause) that arises, directly or indirectly, from Debtor's default in accordance with what is established in the contract. Regardless of what is provided in any other paragraph of this Contract, this indemnity clause will survive the termination of this Contract." (Docket No. 244-6, Exhibit F, 244-8, Exhibit H).

Article IX for both Loan Contracts is titled, "Miscellaneous" and consists of nine (9) sections. The following sections[20] are important to the analysis of the contract in this particular case:

---

honorarios de abogado que resulten por razón de haber recurrido el Banco a sus derechos bajo esta cláusula) que surja, directa o indirectamente, del incumplimiento del Deudor de conformidad a lo establecido en el contrato. No obstante, lo dispuesto en cualquier otro apartado de este Contrato, esta cláusula de indemnización sobrevivirá la terminación de este Contrato." (Docket No. 244-5, Exhibit E, 244-7, Exhibit G).

[20] The following sections of Article IX in the Spanish language provide:

"**Sección 9.02** Dirección de las Notificaciones.  Todas las notificaciones, requerimientos, instrucciones y otras comunicaciones provistas por este acuerdo se harán por escrito (incluyendo telex y comunicaciones telegráficas) y serán enviados por correo, fax, telex y telgrafiado o entregado a la mano a la parte a las direcciones especificadas en la página de firma de este Contrato o a cada parte, a cualquier otra dirección, que de tiempo en tiempo sea notificado por escrito a la otra parte, cumpliendo con los requisitos para notificación especificados en esta Sección. Todas las antes mencionadas notificaciones, requerimientos, instrucciones y otras comunicaciones, se considerarán efectivas en el momento en que se depositen en el correo, se envién por un telex (despúes  de probar el funcionamiento) se entreguen por la compañía de telégrafo o por fax, según sea el caso, dirigidos de la manera antes especificada.

"**Section 9.02** Address for Notices. All notices, demands, instructions and other communication provided by this agreement shall be made in writing (including telex and telegraphic communication) and shall be sent by mail, fax, telex and telegraphed or personally delivered to the party at the addresses specified on the signature page of this Contract, or to each party at any address, from time to time, of which written notice is given to the opposing party, complying with the requirements for notices specified in this Section. All of the above-mentioned notices, demands, instructions and other communication shall be considered effective at the time on which they are put in the mail, are sent by telex (after proving it works) are delivered by the telegraph company or by fax, as the case may be, addressed in the manner previously specified.

**Section 9.06** Governing Law. This Contract and all, the Promissory note and all the Loan Documents shall be governed or interpreted in accordance with the laws of the Commonwealth.

**Section 9.09** Waiver. Acceptance by the Bank of any payment after it is due, or a waiver on behalf of the Bank of an action in any case of default, under this document or relating to the Loan, shall not affect the Debtor's obligations or the Bank's right in regard to any other payment in default." (Docket No. 244-6, Exhibit F, 244-8, Exhibit H).

*BPPR's Position*

BPPR argues that **Loans 9004** and **9002** define the term delinquency ("morosidad") "to characterize the status of untimely payments that would trigger an assessment of Late Fees and Default Rates under these loans." The definition of "mora" has not been defined in Loans 9004 and 9002. BPPR argues that the terms, "'mora' and 'morosidad' are two different and distinct concepts. The Parties chose to define 'morosidad,' and certainly applied it in some instances and terms of Loans 9002 and 9004, and knew when not to apply it and chose another language that was not subject to the definition of 'morosidad,' such as 'mora.' Under Loans 9002 and 9004, the Late Fee will not be assessed until such time as the occurrence of 'morosidad,' which term has been clearly defined in the Loans themselves. The Default Rate, on the other hand, will be

---

**Sección 9.06**. Ley que Rige. Este Contrato y todos, el Pagaré y todos los Documentos de Préstamo serán regidos o interpretados de acuerdo con las leyes del Estado Libre Asociado.

**Sección 9.09** Renuncia. Una aceptación por parte del Banco cualquier pago luego de su vencimiento, o una renuncia por parte del Banco de acción en cualquier caso de incumplimiento bajo este documento o relacionado con el Préstamo, no afectará las obligaciones del Deudor ni el derecho del Banco en relación con cualquier otro pago o incumplimiento." (Docket No. 244-5, Exhibit E, 244-7, Exhibit G).

applicable in the event of 'mora' which is not the same as 'morosidad.'" (Docket No. 243, pgs. 9-10). BPPR argues that the default rate does not reference the term "morosidad," thus the assessment of the default rate for Loans 9004 and 9002 is not subject to the prior expiration of the 30 day period. "BPPR's [p]osition and the interpretation detailed above is consistent with the fact that BPPR applied the Default Rate and assessed the same against the Debtor under Loans 9002 and 9004, and not the Late Fee charge which is subject to such payment having been late for at least 40 days (e.g., 30 days under the definition of 'morosidad,' and thereafter ten additional days under the language in the loan agreement)" (Docket No. 243, pg. 11).

As to the ten (10) day grace period, BPPR submits that there is no ten (10) day cure period prior to assessing the default rate under the relevant loan documents for Loans 9002 and 9004. BPPR's position is that it has the contractual right to assess the Default Rate once a payment is untimely from its original due date. "Debtor's argument is based on its mistaken interpretation that the ten (10) day cure period outlined [in] Article IV of the credit agreements for Loans 9002 and 9004 and titled, 'Default Events' is somehow extensive to the applicability of the Late Fee and Default Rate assessment under Article VIII of the credit agreements for Loans 9002 and 9004. Article IV, Section 4.01 of Loans 9002 and 9004 lists a number of 'Default Events' as well as indicates BPPR's remedies in an event of such defaults. Specifically, section 4.01(h) provides for a ten (10) day period 'to cure any of the situations contained in the preceding paragraphs and, for that reason, the Bank may not request the effect of default [nor exercise its remedies upon such default] until the ten (10) calendar days have passed. From a reading of Section 4.01, we can assess that the remedies for these 'Default Events' are separate and distinct from the application and/or assessment of the Late Fee and Default Rate which are contained independently at Article VIII of Loans 9002 and 9004. Part of the remedies for such defaults are the right to accelerate the Loans, commence collection and foreclosure actions, and exercise remedies which BPPR did not elect to [pursue] under this Article and sections of the relevant loan agreements. The assessment of the Default Rate outlined above is separate and

-32-

apart (and in different articles of the loan documents) from the defaults that may trigger BPPR's remedies under the section titled 'Default Events.'" (Docket No. 243, pgs. 11-12).

*Debtor's Position*

Debtor's position as to loans 9004 and 9002 regarding the grace periods is that: three (3) grace periods are provided pursuant to these loans. The same consist of the following: (i) ten (10) days after the due date of the installment without any late fee or penalty; (ii) at least the next twenty (20) days for the payment of a late fee of 5% of the installment payment; and (iii) at least ten (10) days after the first thirty (30) days and then only after a written notice of delinquency/default before the imposition of a 2% interest penalty rate over the balance of the loan. Thus, according to Debtor, the 5% late fee may be imposed after the ten (10) day grace period and the 2% interest penalty may be imposed forty (40) days after the original due date but, only after a written notice of delinquency/default has been sent to Debtor.

As to the default rate interest penalty, the Debtor argues that the defined term "Delinquency," Sections 4.01(a), 4.01(h) and 4.01(i) need to be read and analyzed together. The Debtor's analysis regarding the interrelation of these clauses is the following:

"Clause 4.01(a), defining default as failure to make payment 'on the due date or other,' makes clear that the due date of the installment payment may not be, and is not, the date triggering a default. The 'or other' date ties this clause to, and makes meaningful and valid, the grace period clauses in the loan contract, i.e., the ten (10) day 'free' period, the twenty (20) day period with a penalty of 5% of the monthly installment, and the ten (10) day period after written notice from the bank for Debtor to cure a default (which includes non-payment of principal and/or interest). If default were strictly non-payment on the due date, as BPPR alleges in its Response, then the three grace period scheme of the loan agreement would become null and superfluous." (Docket No. 245, pg. 7).

The Debtor argues that the late fee penalty and the default rate penalty cannot be concurrent due to the following:

"'Delinquency' is defined as 'a delay of thirty (30) days in the monthly payment corresponding to principal and interest, or principal plus interest.' Therefore, these clauses, read as a whole, square with the loan contracts and promissory notes and with the grace periods regimen established herein. These last clauses are in the section of the loan agreement listing the penalties for payment after the due date and the 2% penalty,

-33-

triggered after a thirty (30) day delay, is in addition to the 5% of the installment payment penalty (after a ten (10) day delay after the due date), but obviously, these two penalties cannot be concurrent. '[A] court must avoid any interpretation that would be 'absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties.'" (Docket No. 245, pg. 8).

The Debtor further argues that the correct interpretation is that which gives effect to both of the provisions regarding the 2% default rate and construe the default provisions in clauses 4.01(h) and (i) as controlling over the general provision and thus requiring a written notice of default prior to the imposition of the 2% default rate.

Subsequently, on October 29, 2014, the Debtor filed its *Objection to Proof of Claim Number 5-1 Filed by Banco Popular de Puerto Rico* stating that it objects to BPPR's amended claim #5-1 based upon the same reasons as its previous objection (Docket No. 153) and that it also objects to the legal fees in the amount of $12,539 which are not referenced or itemized in the amended proof of claim (Docket No. 253). On December 1, 2014, BPPR filed its *Response to Debtor's Objection to BPPR's Amended Proof of Claim 5* arguing as follows: (i) the Debtor has not rebutted the *prima facie* validity of BPPR's amended claim under Fed. R. Bankr. P. 3001(f); (ii) Debtor has failed to present sufficient evidence or support to demonstrate that BPPR has acted contrary to the terms of the loan documents entered into by the parties; and (iiii) the amended proof of claim reflects the amount of outstanding interest, charges and fees actually incurred as of the petition date only, that is, until December 21, 2012, as well as the assessment of reasonable post-petition-interests, costs and fees in accordance with 11 U.S.C. §506(b) (Docket No. 255).

Applicable Law and Analysis

*Standard for Summary Judgment*

Rule 56 of the Federal Rules of Civil Procedure, is applicable to this proceeding by Rule 7056 of the Federal Rules of Bankruptcy Procedure, provides that summary judgment should be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Bankr. P. 7056; *see also*, In re Colarusso, 382 F.3d 51 (1st Cir. 2004), citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"The summary-judgment procedure authorized by Rule 56 is a method for promptly disposing of actions in which there is no genuine issue as to any material fact or in which only a question of law is involved." 10A Wright, Miller & Kane, Federal Practice and Procedure 3d§ 2712 at 198. "Rule 56 provides the means by which a party may pierce the allegations in the pleadings and obtain relief by introducing outside evidence showing that there are no fact issues that need to be tried." Id at 202-203. Summary judgment is not a substitute for a trial of disputed facts; the court may only determine whether there are issues to be tried, and it is improper if the existence of a material fact is uncertain. Id at 205-206.

Summary judgment is warranted where, after adequate time for discovery and upon motion, a party fails to make a showing sufficient to establish the existence of an element essential to its case and upon which it carries the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party must "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

For there to be a "genuine" issue, facts which are supported by substantial evidence must be in dispute thereby requiring deference to the finder of fact.  Furthermore, the disputed facts must be "material" or determinative of the outcome of the litigation.  Hahn v. Sargent, 523 F.2d 461, 464 (1st Cir. 1975), cert. denied, 425 U.S. 904 (1976).  When considering a petition for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party.  Poller v. Columbia Broadcasting Systems, Inc., 368 U.S. 464, 473 (1962); Daury v. Smith, 842 F.2d 9, 11 (1st Cir. 1988).

The moving party invariably bears both the initial as well as the ultimate burden in demonstrating its legal entitlement to summary judgment.  Adickes v. Kress & Co., 398 U.S. 144, 157 (1970).  See also López v. Corporación Azucarera de Puerto Rico, 938 F.2d 1510, 1516 (1st Cir. 1991).  It is essential that the moving party explain its reasons for concluding that the record does not contain any genuine issue of material fact in addition to making a showing of support for those claims for which it bears the burden of trial.  Bias v. Advantage International, Inc., 905 F.2d 1558, 1560-61 (D.C. Cir. 1990), cert. denied, 498 U.S. 958 (1990).

The moving party cannot prevail if any essential element of its claim or defense requires trial.  López, 938 F.2d at 1516.  In addition, the moving party is required to demonstrate that there is an absence of evidence supporting the nonmoving party's case.  Celotex, 477 U.S. at 325.  See also, Prokey v. Watkins, 942 F.2d 67, 72 (1st Cir. 1991); Daury, 842 F.2d at 11.  In its opposition, the nonmoving party must show genuine issues of material facts precluding summary judgment; the existence of some factual dispute does not defeat summary judgment.  Kennedy v. Josepthal & Co., Inc., 814 F.2d 798, 804 (1st Cir. 1987).  See also Kauffman v. Puerto Rico Telephone Co., 841 F.2d 1169, 1172 (1st Cir. 1988); Hahn, 523 F.2d at 464.  A party may not rely upon bare allegations to create a factual dispute but is required to point to specific facts

-36-

contained in affidavits, depositions and other supporting documents which, if established at trial, could lead to a finding for the nonmoving party. Over the Road Drivers, Inc. v. Transport Insurance Co., 637 F.2d 816, 818 (1st Cir. 1980).

The moving party has the burden to establish that it is entitled to summary judgment; no defense is required where an insufficient showing is made. López, 938 F.2d at 1517. The nonmoving party need only oppose a summary judgment motion once the moving party has met its burden. Adickes, 398 U.S. at 159.

In the instant case, the legal issue before the court is solely based on the interpretation of certain contractual clauses regarding late fees and default rate (or additional late fees) which are included in the three (3) loans that the Debtor has outstanding with BPPR. There are no disputes regarding relevant material issues of facts.

Claims Allowance Process and Burden of Proof

11 U.S.C. §502(a) states that, "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest… objects." 11 U.S.C. §502(a). The evidentiary effect of a proof of claim is established in Fed. R. Bankr. P. 3001(f), which provides: "[a] proof of claim executed and filed in accordance with these rules shall constitute *prima facie* evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f). Fed. R. Bankr. P. 3001(f) requires an objecting party to produce "substantial evidence" to rebut this presumption of validity. See Juniper Dev. Group v. Kahn (In re Hemingway Transp., Inc.), 993 F. 2d 915, 925 (1st Cir. 1993). "If the objection is substantial, the claimant "is required to come forward with evidence to support its claims…and bears the burden of proving its claims by a preponderance of evidence." Am. Express Bank, FSB v. Askenaizer (In re Plourde), 418 B.R. 495, 504 (B.A.P. 1st Cir. 2009) (quoting In re Organogenesis, Inc., 316 B.R. 574, 583 (Bankr. D. Mass. 2004); See also Tracey v. United States (In re Tracey), 394 B.R. 635, 639 (B.A.P. 1st Cir. 2008). "Generally,

-37-

a preponderance of the evidence is that evidence which is of greater weight or more convincing." In re Tracey, 394 B.R. at 639 citing Hale v. Department of Transp., Federal Aviation Admin., 772 F. 2d. 882-885 (Fed. Cir. 1985). The claimant bears the ultimate burden of proof regarding a disputed claim. See In re Allegheny Int'l, Inc., 954 F. 2d 167, 174 (3d Cir. 1992)("If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence"). In conformity with section 502(b) if an objection is made, the court shall determine the amount of the allowed claim as of the date of the filing of the petition. 11 U.S.C. §502(b). A creditor's entitlement to pre-petition interest, default interest and late fees pursuant to section 502 is determined by the agreement (contract) between the parties and applicable nonbankruptcy law. Thus, claims that are "enforceable under applicable state law will be allowed in bankruptcy unless they are expressly disallowed." Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co., 549 U.S. 443, 452, 127 S. Ct. 1199, 167 L. Ed. 2d 178 (2007). "Accordingly, if a claim arises from a prepetition right to payment under applicable nonbankruptcy law, then there is a presumption that the claim will be allowed, subject to an express provision of the Bankruptcy Code disallowing it." In re S. Side House, LLC, 451 B.R. 248, 260 (Bankr. E.D.N.Y. 2011). "Interest, fees, costs and charges arising pre-petition are part of the secured creditor's claim in the first instance, and are therefore not governed by §506(b)." In re S. Side House, LLC, 451 B.R. 248, 263-264 (Bankr. E.D.N.Y, 2011) citing In re Vanderveer Estates Holdings, Inc., 283 B.R. 122, 131 (Bankr. E.D.N.Y, 2002). "As such, a creditor's entitlement to prepetition interest under section 502, default or otherwise, is determined in the first instance by the agreement between the parties and applicable nonbankruptcy law." Id. at 264. The United States Supreme Court in United States v. Ron Pair Enters., 489 U.S. 235, 241, 109 S. Ct. 1026, 103 L. Ed. 2d 290 (1989) analyzed Section 506(b) and concluded as follows: "The relevant phrase in §506(b) is: '[T]here shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.' 'Such

claim' refers to an oversecured claim. The natural reading of the phrase entitles the holder of an oversecured claim to postpetition interest and, in addition, gives one having a secured claim created pursuant to an agreement the right to reasonable fees, costs, and charges provided for in that agreement. Recovery of postpetition interest is unqualified. Recovery of fees, costs, and charges, however, is allowed only if they are reasonable and provided for in the agreement under which the claim arose." If the creditor is oversecured, it is entitled to post-petition interest on its claim and the reasonable contractual fees, costs or charges pursuant to the agreement under which such claim originated. Thus, fees, costs, and charges are not allowed if there is no contractual agreement or statutory entitlement. See Alan N. Resnick & Henry J. Sommer, 4 Collier on Bankruptcy ¶506.04[3] (16th ed. 2015).

In the instant case, both parties substantiate the amount of BPPR's claim based on different contractual interpretations of the loan documents regarding the applicability of the late fees and the default interest rate.

*Contractual Interpretation pursuant to the Civil Code of Puerto Rico*

As a general rule, irrespective of particularities in state law, "[i]t is crucial that late-charge and default-interest provisions in mortgage-loan documents be carefully and comprehensively negotiated and drafted to reflect the true intention of the parties in order to avoid having to rely on a court to interpret ambiguous or incomplete language." John C. Murray, *Case Law Summary—Default Interest and Late Charges*, (May 25, 2012), at http://wwww.americanbar.org/content/dam/aba/publishing/rpte_ereport/2012/5_october/rp_murray.authcheckdam.pdf. These provisions need to be clear not only in mortgage-loan documents, but in every contract/agreement that employs these two (2) different provisions which are mechanisms for the lender to safeguard against the costs that it will have to incur if the borrower pays late or defaults on the loan.

Section 9.06 of Article IX of Commercial loan contracts 9002 and 9004 provide that all the loan documents shall be governed or interpreted pursuant to the laws of the Commonwealth

of Puerto Rico. Although the Installment Loan Contract for loan 9003 does not contain an express contract provision that dictates that the law that shall govern the contract interpretation of the loan documents is the laws of the Commonwealth of Puerto Rico, both parties are in agreement that the law of the Commonwealth of Puerto Rico is the applicable law for all three (3) contracts. Moreover, "[p]roperty and contract rights implicated in bankruptcy disputes are determined in accordance with state law." Maids Int'l v. Ward (In re Ward), 194 B.R. 703, 711 fn. 21,(Bankr. D. Mass. 1996) referencing Butner v. United States, 440 U.S. 48, 59 L. Ed. 2d 136, 99 S. Ct. 914 (1979); Ralar Distrib., Inc. v. Rubbermaid, Inc. (In re Ralar Distrib., Inc.), 4 F. 3d 62, 67-69 (1st Cir. 1993). The analysis of the particular contract clauses in controversy must be performed in a holistic manner, meaning that various factors must be considered such as: (i) state law pertaining to interpretation of contracts; (ii) Articles 1053 and 1054 of the Civil Code of Puerto Rico, 31 L.P.R.A. §§3017-3018, which focus on the concept of "mora" or "default" and (iii) how late charges and default interest rate are triggered and/or applied pursuant to the normal industry custom in commercial transactions (installment loans secured by real estate).

Contracts in Puerto Rico are governed by the Civil Code of Puerto Rico (hereinafter referred to as the "PR Civil Code"). Article 1044 of the PR Civil Code provides: "[o]bligations arising from contracts have legal force between the contracting parties, and must be fulfilled in accordance with their stipulations." P.R. Laws Ann. Tit. 31 §2994. Article 1207 of the PR Civil Code establishes: "[t]he contracting parties may make the agreement and establish the clauses and conditions which they may deem advisable, provided they are not in contravention of law, morals, or public order." P.R. Laws Ann. Tit. 31, §3372. Article 1208 of the PR Code states: "[t]he validity and fulfillment of contracts cannot be left to the will of one of the contracting parties." P.R. Laws Ann. Tit. 31 §3373. Article 1210 of the PR Code provides: "[c]ontracts are perfected by mere consent, and from that time they are binding, not only with regard to the fulfillment of what has been expressly stipulated, but also with regard to all the consequences which, according to their character, are in accordance with good faith, use, and law." P.R. Laws

Ann. Tit. 31 §3375. Articles 1233 through 1241 of the PR Civil Code establish the guiding principles for contract interpretation.

Articles 1233 through 1241 of the PR Code provide as follows:

"**Article 1233**: If the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed. If the words should appear contrary to the evident intention of the contracting parties, the intention shall prevail.

**Article 1234**: In order to judge as to the intention of the contracting parties, attention must principally be paid to their acts, contemporaneous and subsequent to the contract.

**Article 1235**: However general the terms of a contract may be, there should not be understood as included therein things and cases different from those with regard to which the persons interested intended to contract.

**Article 1236**: If any stipulation of a contract should admit of different meanings, it should be understood in the sense most suitable to give it effect.

**Article 1237**: The stipulations of a contract should be interpreted in relation to one another, giving to those that are doubtful in the meaning which may appear from the consideration of all of them together.

**Article 1238**: Words which may have different meanings shall be understood in that which may be most in accordance with the nature and object of the contract.

**Article 1239**: The uses or customs of the country shall be taken into consideration in interpreting ambiguity in contracts, supplying in the same the omission of stipulations which are usually included.

**Article 1240**: The interpretation of obscure stipulations of a contract must not favor the party occasioning the obscurity.

**Article 1241:** When it should be absolutely impossible to decide the doubts by the rules established in the preceding sections, if they deal with incidental circumstances of the contract, and said contract involves a good consideration, they shall be decided in favor of the smallest transmission of rights and interest. Should the contract involve a valuable consideration, the doubt shall be decided in favor or the greatest reciprocity of interests." P.R. Laws Ann. Tit. 31 §§3471-3479.

It is an established principle that when the terms of a contract, its conditions and exclusions are clear and specific, and leave no room for controversies, doubt or for different

interpretations, the same should be applied as reflecting the will of the parties at the time of the agreement. See P.R. Laws Ann. Tit. 31 §3471; Unisys Puerto Rico, Inc. v. Ramallo Brothers Printing, Inc., 128 D.P.R. 842, P.R. Offic. Trans. (P.R. June 28, 1991); Heirs of Ramírez v. Superior Court, 81 P.R.R. 347 (1959); In re N-500L Cases, F. Supp. 816, 818 (D.P.R. 1981)("It is black letter law that of the terms of a contract are unambiguous, courts are duty-bound to interpret them as reflecting the will of the parties at the time of the agreement and must refrain from further speculation as to their alleged contractual intentions").  In the instant case, the parties are in disagreement as to what certain clauses in these three (3) agreements (contracts) provide in regards to the late charges and the default interest rate and when these clauses are triggered. Consequently, the court must interpret and determine the will of the parties at the time of the agreements.

In Puerto Rico, the doctrine that has been adopted and established in the construction (interpretation) of contracts is the subjectivity theory (as opposed to the objectivity theory) which focuses on the real intent of the parties. See Marcial Burgos v. Tomé, 144 D.P.R. 522 (1997), P.R. Offic. Trans. (P.R. 1997) ("A vast part of the doctrine coincides with this interpretation in the sense that in cases involving contract interpretation, the rules of subjective interpretation must prevail over those of objective interpretation"). "Interpretation of a contract implies reconstructing the meaning of a negotiation in order to arrive at the parties' intent." Unisys Puerto Rico, Inc. v. Ramallo Brothers Printing, Inc., 128 D.P.R. 842 (1991), P.R. Offic. Trans. (P.R. June 28, 1991) citing Ramírez, Segal & Látimer v. Rojo Rigual, 123 D.P.R. 161 (1989). In construing the terms of a contract, the same should be read together and harmonized so as to determine the true will of the parties. See Carrillo Norat v. Camejo, 107 D.P.R. 132 (1978), 7 P.R. Offic. Trans. 144 (1978).   In the seminal case of Marcial Burgos v. Tomé, 144 D.P.R. 522 (1997), P.R. Offic. Trans. (P.R. 1997), the Supreme Court of Puerto Rico stated the following regarding contract construction (interpretation):

"As we know, the tendency of courts is to limit interpretation to cases in which it becomes truly necessary. Interpreting a contract to determine whether it is clear entails

-42-

harmonizing its text with the intention of the parties. With regard to the process of analysis to be followed in such cases, we agree with the Supreme Court of Spain when it points out that:

[A]lthough it is the first element of interpretation, the grammatical element presupposes interpretation, because affirming that a clause is clear entails a valuation of words and of their congruence with the will [of the parties]; thus, clarity must be present and stand out in the intention of the contracting parties more than in the terms of the contract. Judgment of December 9, 1965, No. 5603, XXXII-2 Repertorio de Jurisprudencia 3433."

The Supreme Court of Puerto Rico in Co-op. La Sagrada Familia v. Castillo, 107 D.P.R. 405, 417, 7 P.R. Offic. Trans. (P.R. 1997) analyzed Article 1234 of the PR Civil Code, P.R. Laws Ann. Tit. 31 §3472 pursuant to an interpretation rendered by the Supreme Court of Spain. The court stated as follows:

"Regarding this rule of interpretation, the Supreme Court of Spain has stated in the Judgments of April 20, 1944 and January 14, 1964 that construction of contracts  and other juristic acts, even if arising from the expressions contained in the words said or written, cannot stop at the rigorous or grammatical sense of the same, and that the intention of the parties and the spirit and purpose that has governed the transaction must be fundamentally investigated, inferring from the concurring circumstances and from the total conduct of the interested parties, as sanctioned by said article, which does not exclude prior acts or other circumstances that may contribute to the proper investigation of the will of the executing parties." See also; Marcial Burgos v. Tomé, 144 D.P.R. 522 (1997), P.R. Offic. Trans. (P.R. 1997).

As part of the subjectivity theory of contract interpretation, the court must also take into consideration the following factors: the circumstances, the contracting parties involved, their experience and expertise regarding the particular contract they negotiated. See Marcial Burgos v. Tomé, 144 D.P.R. 522 (1997), P.R. Offic. Trans. (P.R. 1997) citing Ramírez, Segal & Látimer v. Rojo Rigual, 123 D.P.R. at 174, P.R. Offic. Trans. at 164);  Unisys Puerto Rico, Inc. v. Ramallo Brothers Printing, Inc., 128 D.P.R. 842 (1991), P.R. Offic. Trans. (P.R. June 28, 1991).  Another element that is employed in determining the intention of the parties is not only the contracts executed by the parties but also the customary practices of certain industries. In this case, the

banking's industry appropriate customary practice application of late fees and default interest rate for installment loans secured by real estate. See Unisys Puerto Rico, Inc. v. Ramallo Brothers Printing, Inc., 128 D.P.R. 842 (1991), P.R. Offic. Trans. (P.R. June 28, 1991) ("In order to determine the intention of the parties—Ramallo, Unisys, and MIC--- the trial court, among other things, must take into consideration not only the contracts executed by the parties but also the industry's marketing practices, the parties' actions prior to, during and after the contract, the identity of the parties, with special attention to the expertise that all or some of them have on the subject matter of the contract").

Commentator Puig-Brutau discusses the articles from the Civil Code of Spain which are analogous (equivalent) to the Civil Code of Puerto Rico regarding the interpretation (construction) of contract clauses. Article 1236[21] provides: "[i]f any stipulation of a contract should admit of different meanings, it should be understood in the sense most suitable to give it effect." P.R. Laws Ann. Tit. 31 §3474. Puig-Brutau explains that this particular rule of construction is referred to by some authors as the principle of the conservation of contract, which means that it ensures that the interpretation of the contract be effective and that it corresponds to the real intention of the parties. There are two (2) different assumptions: (i) the doubt between a useful meaning and; (ii) a useless (or unfit) meaning in which the obvious choice is the first one. If one must choose between two useful (fit) meanings; one which is a maximum and the other a minimum, then the principle of the conservation of the contract no longer prevails and it is necessary to employ other mechanisms (tools/skills) of interpretation. Puig-Brutau explains that it is more reasonable that if there is doubt as to the maximum and minimum effect (result) of an

---

[21] The counterpart of Article 1236 of the PR Code is Article 1284 of the Code of Spain which provides: "[i]f any stipulation of a contract should admit of different meanings, it should be understood in the sense most suitable to give it effect."

effective contract, the minimum effect is preferred because it is not reasonable that the solution to a doubt consists in substituting it with the maximum effect, since it will open the possibility of an erroneous interpretation, if it exists, and which will result in the maximum error.[22] See  J. Puig-Brutau, Doctrina General del Contrato, Barcelona, Ed. Bosch, S.A., 1978, T. II, Vol. I, pg. 246.   Puig Brutau referencing commentator Díez-Picazo explains that for a contract to be analyzed "…in the sense most suitable to give it effect," it means that the same must be examined from the perspective of having the most adequate result or producing the typical effectiveness (result) or the intended economic function of the contract, and also the final objective (end) it sought to accomplish.[23]  Id. at pg. 247.

If there are words included in the contract that cause doubts, this may be the result of using general terms or words that might have different meanings.  Article 1238[24] provides that: "[w]ords which have different meanings shall be understood in that which may be most in accordance with the nature and object of the contract." P.R. Laws Ann. Tit. 31 §3476. Commentator Puig-Brutau citing Díez-Picazo explains that the nature of the contract refers to the

---

[22] "Esta regla responde a lo que algunos autores llaman el principio de la conservación del contrato, que significa que la interpretación ha de procurar que el contrato sea eficaz, por ser más natural entender que ello es lo que corresponde a la voluntad de las partes. Pero, como hace notar razonablemente Díez-Picazo, hay que distinguir dos supuestos diferentes: en la duda entre un significado útil y otro inútil, es natural decidirse por el primero (*magis valeat quam pereat*); pero si se trata de optar entre dos significados útiles, uno máximo y otro mínimo, ya no se está en el caso de tener en cuenta el principio de la conservación del contrato, sino que es necesario poner en juego los demás medios interpretativos.

Incluso parece más razonable que la duda entre el efecto máximo y el mínimo de un contrato eficaz, quede resuelta a base de preferir el efecto mínimo (*in dubio pro debitoris*); es decir, no es razonable que la solución de una duda consista en sustituirla por un efecto máximo, pues con ello quedaría abierta la posibilidad de que la interpretación errónea, si existiera, produjera también el máximo error." J. Puig-Brutau, Doctrina General del Contrato, Barcelona, Ed. Bosch, S.A., 1978, T. II, Vol. I, pg. 246.

[23] "El sentido 'más adecuado para que produzca efecto' el contrato, hay que entenderlo, dice Díez-Picazo, como el efecto más adecuado o la eficacia típica o a la función económica del contrato y también por la finalidad práctica que se trata de alcanzar." Id. at pg. 247.

[24] The counterpart of Article 1238 of the PR Code is Article 1286 of the Code of Spain which provides: "[w]ords which have different meanings shall be understood in that which may be most in accordance with the nature and object of the contract."

generic type or category a particular contract belongs to (for example a purchase-sale agreement, a lease agreement, a partnership agreement, etc.) and that the object of the contract alludes to the contract's finality. It is worth noting that a contract not only produces the effects/results that were expressly agreed to, but also those that, "which according to their character, are in accordance with good faith, use, and law."[25] (Article 1210 of the PR civil Code, P.R. Laws Ann. Tit. 31 §3375). See J. Puig-Brutau, Doctrina General del Contrato, Barcelona, Ed. Bosch, S.A., 1978, T. II, Vol. I, pg. 246.

In order to be able to properly analyse the contracts before us, the concepts of delay and default due to delay (referred to as "retraso" and "mora") must be differentiated and the concept of default due to delay or "mora" in its different modalities must be explained to better understand the clauses in controversy.

*Concept of Delay and Default due to Delay ("Retraso" v. "Mora")*

Articles 1053, 1054 and 1061 of the Civil Code of Puerto Rico, 31 L.P.R.A. §§3017-3018 & 3025, address the concept of "default due to delay" or "mora." Article 1053[26] of the PR Code provides:

---

[25] "Pero cabe preguntar qué entiende el Código, en este artículo, cuando habla de la 'naturaleza' y del 'objeto' del contrato. Observa Díez-Picazo que es probable que cuando menciona la naturaleza se refiera al tipo genérico a que pertenezca el contrato (v. g., si se trata de una compraventa, de un arrendamiento, de una sociedad, etc.), y que al hablar del objeto alude, en cambio, a su finalidad. Conviene recordar que el contrato no sólo produce los efectos expresamente pactados, sino todos los que, 'según su naturaleza, sean conformes a la buena fe, al uso y a la ley (art. 1.258)." J. Puig-Brutau, Fundamentos de Derecho Civil: Doctrina General del Contrato, Barcelona, Ed. Bosch, S.A., 1978, T. II, Vol. I, pg. 246.

[26] The counterpart of Article 1053 of the PR Code is Article 1100 of the Code of Spain which provides:
"Persons obliged to deliver or to do something are in default from the moment when the creditor demands the fulfilment of their obligation, judicially or extrajudicially.

However, the demand of the creditor, in order that default may exist, shall not be necessary:
  (1) If the obligation or law declares it expressly.
  (2) If by reason of its nature and circumstances it may appear that the fixing of the period within which the thing was to be delivered or the service rendered was a determinate cause to constitute the obligation.

-46-

"Persons obliged to deliver or to do something are in default from the moment when the creditor demands the fulfilment of their obligation, judicially or extrajudicially.

However, the demand of the creditor, in order that default may exist, shall not be necessary:

(1) If the obligation or law declares it expressly.
(2) If by reason of its nature and circumstances it may appear that the fixing of the period within which the thing was to be delivered or the service rendered was a determinate cause to constitute the obligation.

In mutual obligations none of the persons bound shall incur default if the other does not fulfil or does not submit to properly fulfil what is incumbent upon him. From the time one of the persons obligated fulfils his obligation the default begins for the other party." P.R. Laws Ann. Tit. 31 §3017.

Article 1054[27] of the PR Code states:

"Those who in fulfilling their obligations are guilty of fraud, negligence, or delay, and those who in any manner whatsoever act in contravention of the stipulations of the same, shall be subject to indemnify for the losses and damages caused thereby." P.R. Laws Ann. Tit. 31 §3018.

Article 1061[28] provides the following:

"Should the obligation consist in the payment of a sum of money, and the debtor should be in default, the indemnity for losses and damages, should there not be a stipulation to the contrary, shall consist in the payment of the interest agreed upon, and should there be no agreement, in that of the legal interest.

---

In mutual obligations none of the persons bound shall incur default if the other does not fulfil or does not submit to properly fulfil what is incumbent upon him. From the time one of the persons obligated fulfils his obligation the default begins for the other party."

[27] The counterpart of Article 1054 of the PR Code is Article 1101 of the Code of Spain which provides: "Those who in fulfilling their obligations are guilty of fraud, negligence, or delay, and those who in any manner whatsoever act in contravention of the stipulations of the same, shall be subject to indemnify for the losses and damages caused thereby."

[28] The counterpart of Article 1061 of the PR Code is Article 1108 of the Code of Spain which provides: "Should the obligation consist in the payment of a sum of money, and the debtor should be in default, the indemnity for losses and damages, should there not be a stipulation to the contrary, shall consist in the payment of the interest agreed upon, and should there be no agreement, in that of the legal interest."

-47-

Until another rate is fixed by the Government, interest at the rate of six percent (6%) per annum shall be considered as legal." P.R. Laws Ann. Tit. 31 §3025.

The analysis of the juridical figure of default of the debtor due to delay (or "mora") is considered a thorny issue by the majority of the commentators of Spain that have studied extensively this juridical figure under the Civil Code of Spain and the Civil Code of Puerto Rico. See Gema Diez-Picazo Gimenez, La Mora y la Responsabilidad Contractual, Madrid, Ed. Civitas, S.A., 1996, pg. 342.[29] Commentator Diez-Picazo Gimenez explains that the terms default due to delay ("mora") and delay ("retraso") are not synonyms and the same do not have to coexist (or even coincide). There is delay if the obligation is due and the debtor has not complied (fulfilled) with the contractual obligations, and in order to fully comply it is necessary to provide an additional period of time, which was already agreed to by the parties. However, the default of the debtor due to delay ("mora") requires for a debtor to have breached his or her obligation and for the creditor to request specific performance of the obligation(s), unless the law or the parties have expressly or tacitly waived the same. The purpose of the creditor requesting the debtor's specific performance is simply to transfer all of the fortuitous risks resulting from an untimely performance (fulfilment) of its obligations to the debtor Id. at 344. [30] To be in default due to delay is synonymous to transferring the risks to the debtor.

---

[29] Commentator Gema Diez-Picazo Gimenez states the following regarding the juridical figure of default of the debtor due to delay ("mora"): "Sin embargo, es conveniente, si se quiere ofrecer un panorama correcto del estado en que se encuentra hoy en día la figura de la constitución en mora del deudor, no eludir tan espinoso tema." Gema Diez-Picazo Gimenez, La Mora y la Responsabilidad Contractual, Madrid, Ed. Civitas, S.A., 1996, pg. 342.

[30] Commentator Gema Diez-Picazo Gimenez states as follows in the Spanish language: "Todos los autores están de acuerdo en afirmar que "mora" y "retraso" no son términos que necesariamente han de coincidir. No son sinónimos. Retraso hay si llegado el momento del cumplimiento (llegado el vencimiento de la obligación), el deudor no ha cumplido lo pactado y para cumplir exacta y correctamente la prestación, a la que y voluntariamente se ha obligado, es preciso otorgarle un plazo de tiempo superior al previsto y pactado en el momento de la constitución de la obligación. Por el contrario, en situación de mora se encuentra aquel deudor incumplidor al que le ha sido exigido el cumplimiento, salvo que la ley o las partes hayan prescindido de tal requisito expresa o tácitamente. Pero, el

-48-

Pursuant to the majority doctrine of the Commentators of the Civil Code of Spain, there are three (3) main modalities that may result upon a debtor's default. These are as follows: (i) the debtor fails to comply with the specific performance at the time the same is due, but he or she may still comply with the specific performance because the obligation does not exclude untimely (late) performance of the same, without prejudice that the creditor gets indemnified for the damages resulting from the delay or the default due to the delay; (ii) the debtor fails to comply with the specific performance in a clear manner and the cause for the non-compliance is due to the debtor's fault ("culpa") or fraud ("dolo"). The Law will provide the manner to effectively counterbalance this lack of total performance; and (iii) the debtor's performance does not fully comply with the requisites of the obligation, meaning that the performance is deficient. In this case, the debtor is responsible for his/her/its deficient compliance.[31] See J. Puig-Brutau, Fundamentos de Derecho Civil: Derecho General de las Obligaciones, Barcelona, Ed. Bosch, S.A., 1985, T. I, Vol. II, pg. 412.

In the case at hand, the first modality is the one that is applicable since the debtor is complying with the specific performance of its monthly payment obligation but does so in an

---

significado o fundamento de realizar tal interpelación o no hacerlo, es sola y exclusivamente uno: trasladarle al deudor todos los riesgos fortuitos que puedan afectar a la tardía ejecución de la prestación (la llamada "perpetuatio obligationis"). Y esto tiene sentido, si se tiene en cuenta que al acreedor, que no está obligado a admitir un cumplimiento posterior o tardío, ya que puede desistir del contrato, se le otorga una medida para la protección de sus intereses." Id. at 344.

[31] Commentator Puig Brutau states the following in the Spanish language: "Siguiendo el criterio dominante, señalaremos los diversos aspectos que puede ofrecer el incumplimiento del deudor:

1. El deudor no cumple la prestación en el momento debido, pero todavía puede hacerlo por no excluir la obligación el cumplimiento retrasado, sin perjuicio de la obligación de indemnizar los daños resultantes del retraso o mora.
2. El deudor no cumple la prestación debida, de manera definitiva y por causa que le es imputable (culpa o dolo). El Derecho ha de proporcionar entonces la manera de contrarrestar con eficacia esta falta total de cumplimiento.
3. El deudor realiza una prestación que no se ajusta a lo que exige el vínculo obligatorio; es decir, cumple, pero cumple mal. En este caso existirá responsabilidad por cumplimiento defectuoso."

untimely manner. This modality is referred to as the default due to delay by the debtor in the specific performance of an obligation ("la mora o retraso en el cumplimiento").

The concept of the debtor's default due to delay (which is referred to as "*mora debendi*") in turn consists of four (4) assumptions which are the following: (i) the default that takes place after the creditor demands compliance with their obligation; (ii) the default that arises by virtue of the law; (iii) the default that originates from the agreement between the parties; and (iv) the default due to delay that stems (originates) from the nature and circumstances of the obligation. Even though the consideration ("la causa") is different for these (4) assumptions, the end result (the resulting effect) is the same, which is that the debtor is responsible for any event that may affect the specific performance of the obligation. The debtor's default due to delay is an additional layer of responsibility or the debtor.[32] See Gema Diez-Picazo Gimenez, La Mora y la Responsabilidad Contractual, Madrid, Ed. Civitas, S.A., 1996, pg. 508.

Generally, the concept of default due to delay ("mora") by the debtor requires that the breach or default be temporary and susceptible of a subsequent and untimely performance. However, there is another interpretation regarding the concept of default due to delay ("constitución de mora") in which the default due to delay is regulated in a different manner depending on the type of obligation; such as obligations with definite periods, pure and

---

[32] Commentator Gema Diez-Picazo Gimenez states as follows in the Spanish language: "En resumen se puede decir que son cuatro los supuestos de mora del deudor: el que tiene lugar tras la interpelación del acreedor, el que nace en virtud de la ley, el que se origina por el convenio de las partes y el que surge de la propia naturaleza y circunstancias de la obligación. Todos ellos producen el mismo efecto en el ámbito de la responsabilidad del deudor, puesto que le sujetan u obligan, hasta el momento del cumplimiento exacto de la obligación, a soportar y responder de todos los eventos que sobrevenidamente puedan afectar a la correcta ejecución de la prestación, aunque cada uno de ellos surge por una causa diferente. Es a cada uno de estos casos de *mora debendi* al que hay que dedicar esta parte del estudio, porque, sin duda alguna, llevará a afirmar la independencia de la figura de la constitución en mora en nuestro Derecho de las obligaciones. La mora del deudor no es otra cosa más que otro efecto de la responsabilidad del deudor."

-50-

conditional obligations, and obligations with a final (essential) term. See Gema Diez-Picazo Gimenez, La Mora y la Responsabilidad Contractual, Madrid, Ed. Civitas, S.A., 1996, pg. 515.

The default due to delay of monetary obligations is addressed in Article 1061 of the PR Code, which provides that the indemnity for losses and damages, if there is no stipulation to the contrary, will consist in the payment of the interest agreed upon by the parties, and if there is no agreement, there will be an automatic imposition of interest at the legal rate[33]. See Gema Diez-Picazo Gimenez, La Mora y la Responsabilidad Contractual, Madrid, Ed. Civitas, S.A., 1996, pg. 578. In conformity with the principle of *pacta sunt servanda,* which means that the agreement is the law between the parties, if the parties have agreed that after a specific term (a certain time) the risks will get transferred to the debtor or the same will pay a specific interest rate for the amounts owed, the applicable rule is *dies interpellat pro homine (*"el tiempo no interpela por el hombre"), meaning that debtor is automatically considered to be in default (due to delay or "mora") after an agreed upon term(s) by the parties is (are) due. This concept is referred as the "automatic default by delay" (or "mora automática" in the Spanish language) and means that the default interests will begin automatically from the moment that the debtor is juridically responsible for the default (lack of performance) pursuant to the modality of the indemnity due to default agreed to by the parties in conformity with the terms (clauses) of the contract. The purpose of the default interest due to delay (or "intereses moratorios" in the Spanish language) is to compensate or repair the economic harm that was caused due to the default of the monetary

---

[33] Commentator Gema Diez-Picazo Gimenez states as follows in the Spanish language: Por último, el Código Civil establece un sistema especial de responsabilidad por los daños derivados del incumplimiento de una obligación pecuniaria, que se concreta en el devengo automático de intereses legales, o convencionales desde que el deudor incurre en mora (art. 1.108 Cc). Por regla general, la doctrina ha centrado la especialidad de las obligaciones pecuniarias precisamente en este efecto que provoca su incumplimiento."

obligation.[34] See Gema Diez-Picazo Gimenez, La Mora y la Responsabilidad Contractual, Madrid, Ed. Civitas, S.A., 1996, pg. 588-589.

In order to properly analyze the instalment loan contracts it is important to understand the purpose for the imposition of the late fees and default interest rates in loans secured by real estate (commercial transactions).

*Late Fees and Default Interest Rate*

The majority of the cases that explain the reasoning behind the imposition of the late fees and default interest rates are cases in which the court had to assess the "reasonableness" of the late charges and the default interest rate[35], which is not the issue before this court, but serves to

---

[34] Commentator Gema Diez-Picazo Gimenez states as follows in the Spanish language: "La exigencia efectiva del acreedor reclamando el cumplimiento de la obligación, por su parte, es indispensable para fijar el momento del incumplimiento si la ley no establece nada o si las partes nada han pactado, ya que si convienen en que con la simple llegada del término de cumplimiento el deudor correrá con los riesgos o pagará intereses por la suma adeudada, el problema se simplifica por la aplicación de la regla *dies interpellat pro homine*: El incumplimiento queda concretado con el vencimiento del término pactado y a partir de ese momento el deudor queda sujeto a todas las consecuencias que se derivan de la responsabilidad. Se habla de constitución en mora del deudor de la obligación pecuniaria precisamente para negar la relevancia jurídica de los simples retrasos. Es necesario para el legislador de 1889 que la infracción de la obligación sea considerada jurídicamente como un incumplimiento obligacional y la única manera que existe para fijarlo, cuando las partes o han pactado algo distinto, es que el acreedor exija efectivamente el pago de su crédito. Hasta entonces, el retraso que sufra el cumplimiento de la obligación no será considerado causa de responsabilidad por parte del ordenamiento jurídico. Esta regla sólo sufre las excepciones previstas en los dos números del segundo párrafo del artículo 1.100 (mora automática). La importancia de la constitución en mora como criterio de determinación del ilícito obligacional se ve más claramente si se tiene en cuenta que el devengo de los intereses moratorios comienza automáticamente desde ese momento, desde el mismo instante que se considera al deudor responsable jurídicamente de la falta de cumplimiento.

'La indemnización consistirá en el pago de los intereses convenidos, no habiendo pacto en contrario' dice literalmente el artículo 1.108, lo que significa que las partes pueden pactar la modalidad de indemnización por incumplimiento que tengan por conveniente y este pacto debe anteponerse a la previsión que realiza el precepto. Los intereses a que alude esta norma son los intereses moratorios, que no tienen otra función que no sea la de compensar o reparar los daños causados por el incumplimiento de la obligación pecuniaria. No se ve problema alguno en admitir que pueden devengarse automáticamente desde el momento que fijen las partes, en virtud del principio *dies interpellat pro homine* y que llegado el término de cumplimiento fijado convencionalmente se entienda incurso en mora al deudor o lo que es lo mismo, que se le considere incumplidor."

[35] The reasonableness of default interest rate and late fees is discussed in cases for post-petition interest, fees and costs pursuant to 11 U.S.C. §506(b). See In re 1095 Commonwealth Ave. Corp., 204 B.R. at 305 ("Both the late charge and the default rate of interest are intended to compensate the lender for the increased costs of administration caused by the borrower's failure to make payment as and when it is due. Citizens [creditor] can recover one or the other, but both would be inequitable and unreasonable within the meaning of §506(b). In re Kalain, 178 Bankr. 308, 312 n. 9 and 316 n. 18 (Bankr. D.R.I. 1995)); See also In re Vest Associates, 217 B.R. at 701 ("The decisional law is

illustrate the purpose or the reasons for the imposition of these charges. A five percent (5%) late fee based on a percentage of the delinquent instalment is the prevalent industry custom in commercial transactions. The five percent (5%) late fee is generally intended to compensate for the administrative costs of doing business such as servicing delinquent loan payments. See Metlife Capital Fin. Corp. v. Wash. Ave. Assocs. L.P., 159 N.J. 484, 497-500 (N.J. 1999); In re 1095 Commonwealth Ave., Corp., 204 B.R. 284, 305 (Bankr. D. Mass. 1997) aff'd, 236 B.R. 530 (D. Mass. 1999). ("Both the late charge and the default rate of interest are intended to compensate the lender for the increased costs of administration caused by the borrower's failure to make payment as and when it is due"). In In re Vest Assocs., 217 B.R. 696, 701 (Bankr. S.D.N.Y. 1998) the court explained the reasoning as to why default interest rates are employed by stating:

> "Parties use default interest rates as a means to compensate a lender for the administrative expenses and inconvenience in monitoring untimely payments. Because the costs incurred in performing this task will vary from case to case, the increased interest rate is a compromise by the lender and the borrower in recognition of the fact that attempting to quantify the exact dollar amount of the lender's injury would be impractical. In re Terry, L.P., 27 F.3d 241, 244 (citing In re Consolidated Properties, L.P., 152 B.R. 452, 457 (Bankr. D. Md. 1993))), cert. denied, 513 U.S. 948, 115 S. ct. 360, 130 L. Ed. 2d 313 (1994). The inclusion of a default rate actually may benefit a debtor because it has the benefit of a lower rate until an event triggering default occurs. Ruskin V. Griffiths, 269 F. 2d 827, 832 (2d Cir. 1959), cert. denied, 361 U.S. 947, 80 S. Ct. 402, 4. L. Ed. 2d 381 (1960) (anticipating a possible loss in the loan due to bankruptcy would require lender to impose a higher uniform interest rate for the entire life of the loan)" In re Vest Assocs., 217 B.R. at 701.

uniform that oversecured creditors may receive payment of either default interest or late charges, but not both. In re Kalian, 178 B.R. 308, 312 n. 9 and 316 n. 18 (Bankr. D.R.I. 1995); In re 1095 Commonwealth Ave. Corp. 204 B.R. 284, 305 (Bankr. D. Mass. 1997)). The other legal scenario in which late charges and default interest in connection with commercial mortgage-loan transactions may be disallowed in whole or in part is if one more of the following factors are present: (1) usurious additional interest; (2) invalid penalty; (3) unreasonableness; (4) unconscionability; and (5) unenforceable liquidated damages. See John C. Murray, *Case Law Summary—Default Interest and Late Charges* (May 25, 2012).

*Discussion*

Article 1234 of the PR Code provides that: "[i]n order to judge as to the intention of the contracting parties, attention must principally be paid to their acts, contemporaneous and subsequent to the contract." P.R. Laws Ann. Tit. 31 §3472. In our jurisdiction, it is established that the subjectivity theory is the prevalent doctrine employed in contractual interpretation and the same focuses on the real intent of the parties. The real intent of the parties is inferred from the parties' total conduct which includes their prior acts, concurring circumstances and the parties' actions after the contract. In our case, there is a successor creditor, BPPR, which was not the original party to the three (3) different loan agreements in controversy. Mr. Antonio Betancourt, Debtor's President, testified that the Debtor had the loans with Westernbank (predecessor creditor) for seven (7) years and that during this period, it never defaulted on the loans. He further testified that after BPPR took over the loans from Westernbank, BPPR did not apply the ten (10) day grace period clauses, rather the 2% late fee penalties are charged the day after the due date. Mr. Betancourt explained that the ten (10) day grace period clauses were negotiated with Westernbank and it was like a mini line of credit.

It is important to state that for our analysis the terms delay ("retraso" or "demora") and default due to delay ("mora") have distinct meanings. The main difference is that the default of the debtor due to delay requires for a debtor to have breached (defaulted on) its obligation(s). However, the delay ("retraso" or "demora") is an additional period of time which was agreed to by the parties in the contract.

Loan 9003

The Loan 9003 which is titled, "*Installment Loan Contract*" will be analyzed first, since the contract (agreement) is substantially different from the contractual agreements for Loans

-54-

9002 and 9004. The contract has two (2) separate clauses for late fees (Section 1(G)) and Default Interest (Section 1(E)).

This court finds that there is no ambiguity in Section 1(G). The same is clear since it provides that the Corporation will pay the Bank a late charge which is equivalent to 5% of the monthly payment for payments made ten (10) days after the due date of the monthly installment of the Installment Loan. This late charge is for the payment delay ("retraso" or "demora") and constitutes an additional period of time (10 days) which was agreed to by the parties in the contract.

Clause 1(E) is titled, "Delinquent Interest" ("Intereses por Mora"), according to the Debtor's translation, and it specifically provides that: "[i]n the event of delinquency [default] in the payment of the principal or interest of the Installment Loan, all of the amounts owed by the Corporation will earn interest at the rate resulting from adding two (2) percentage points to the rate agreed to, from **the date of the** [**default**] ("incumplimiento") until full payment of the amounts owed." The court notes that Clause 1(E) is specifically referring to the payment of the principal or interest of the Installment Loan, unlike Clause 1(G) that specifically refers to the imposition of a 5% late charge on the monthly payments. Clause 1(E) is triggered from the date of the default and references Clause 1(I), which is titled, "*Default*." Clause 1(I), is an acceleration clause which the Bank may employ to accelerate the unpaid balance of the Installment Loan under four (4) scenarios (events). Clause 1(I) provides:

> "Default: The Bank may, at its option, accelerate the due date of the unpaid balance of the Installment Loan and proceed to collect it by legal means if any of the following events occur: (i) failure to pay the principal and/or interest of any promissory note or obligation by the Corporation on its due date: and/or (ii) default by the Corporation of any of the terms and conditions of this contract, or any other obligation with the Bank; and/or (iii) if for any reason the Corporation's financial or economic situation deteriorates or changes adversely; and/or (iv) a

-55-

change of control in the Corporation's shareholders without prior notice given to the Bank."

The court finds that pursuant to the clauses of this particular "Installment Loan Contract" for Loan 9003, the Bank is entitled to the 5% late charges of the monthly payments if the same are made ten (10) days after the due date. However, the Bank is entitled to the default interest rate upon the date of default, which in turn references Clause 1(I), that is titled Default and is an acceleration clause that triggers the unpaid balance of the Installment Loan before maturity.  The court concludes that the lender's ability to charge default interest is tied to its option to accelerate payment of the unpaid loan balance before maturity for this particular contract and in order to collect its unpaid balance the Bank must do so through legal action as stated in Clause 1(I). The Bank has not accelerated the due date of the unpaid balance and has not initiated legal action. Thus, the Bank pursuant to the clauses of Loan 9003 that have been discussed is not entitled to default interest rate unless the acceleration clause is triggered.

Loans 9002 and 9004

The contractual clauses of loans 9002 and 9004 will be analyzed together due to the similarity of the loan contracts (similar template).  The court finds that certain clauses in these agreements are inconsistent, and this contributes to the source of confusion.

Article I of both loans 9002 and 9004 define the term "Delinquency" [Default due to Delay] ("Morosidad") as: "a delay of thirty (30) days in the monthly payment corresponding to the principal and interest, or principal plus interest."

Article IV of these loan agreements is titled, "Default" and Section 4.01 is titled, "Default Events." Amongst the "Events of Default," the following pertain to our controversy:

"a. Default by the Debtor in the payment or principal, or in the payment of the interest on the Promissory Note when said payments are due (on a due date or other);

c. The Debtor is found to be insolvent or bankrupt, or has admitted in writing that he is incapable of paying his debts as these come due or makes an assignment of his property to the benefit of the creditors, or the Debtor requests or consents to the appointing of a guardian, receiver or similar officer for the entirety or any substantial part of his property; or the Debtor constitutes (by petition, request, answer, consent or otherwise) any bankrupt proceeding, insolvency, composition, reorganization, arrangement, readjustment of debts, or any other similar proceeding under the laws of any jurisdiction; or that any judgment, order, attachment, legal or administrative decision, or similar item is issued against any of Debtor's property and said judgment, order, attachment, legal or administrative decision, or similar item is not set aside, cancelled or bonded within (30) days of it being issued or imposed;

d. Default or violation on behalf of Debtor of any of the terms, agreements, clauses or conditions on its part, in their material aspects included in this Contract, the other Loan Documents and/or any other agreement, contract or instrument with the Bank;

h. The Debtor will have a period of ten (10) calendar days to cure any of the situations contained in the preceding paragraphs, and for that reason, the Bank may not request the effect of default until the ten (10) calendar days have elapsed." (Docket No. 244-6, Exhibit F, 244-8, Exhibit H).

"i. **Interest in the event of default: In the event of default, on behalf of the debtors, under the terms of this contract, starting from the date of sending the notice to the debtors by the Bank or by the holder of the promissory note given as guarantee, the latter shall begin to earn interest on the unpaid balance at the *preferred rate* by adding two (2) percentage points to the prime interest rate established in the loan on the date of the notice previously mentioned"** (**Loan 9004**-Docket No. 244-6, Exhibit F).

"i. **Interest in the event of a default: In the event of default, on behalf of the debtors, under the terms of this contract, starting from the date of sending the notice to the debtors by the Bank or by the holder of the promissory note given as guarantee, the latter shall begin to earn interest on the unpaid balance at the preferred rate by adding two (2) percentage points to the *prime interest rate* established in the loan on the date of the notice previously mentioned"** (**Loan 9002**-Docket No. 244-8, Exhibit H).

"In case of a Default Event as described in Section 4.01(c), the commitment of the Bank shall be terminated and/or the principal of and any interest accrued on the Promissory Note and all the other obligations of the Debtor under this document, become due and payable, automatically, without any action on behalf of the Bank, without notifying the Debtor or any other person, without protest, presentment, demand, or notice, all of which are expressly waived; in case of any Default Event, the Bank, by written notice given to the Debtor (a) may immediately terminate the Bank's commitment and/or (b) declare the principal of any accrued interest on the Promissory Note to be due, as well as all the Debtor's obligations due and payable, without the need for notice, protest, representation and/or demand, all of which are expressly waived; in case of any other Default Event, the Bank through written notice given to the Debtor (a) may immediately terminate the Bank's commitment and/or (b) declare the principal of any accrued interest on the Promissory Note to be due, as well as all the Debtor's obligations due and payable, without the need for notice, protest, representation and/or demand, all of which are expressly waived." (**Loan 9004**-Docket No. 244-6, Exhibit F, **Loan 9002**-Docket No. 244-8, Exhibit H).

Article VIII is not titled and is not divided in sections. However, Article IV and VIII must be harmonized. Article VIII is divided into three (3) clauses which are titled as follows: (i) "Late Fees" ("Cargo por Demora); (ii) "Additional Late Fees" ("Cargos Adicional por Demora") and "Indemnity" ("Indemnización"). The clause titled, "Late Fees" ("Cargos por Demora") states the following: "[f]or each monthly payment that is delinquent for more than ten (10) days, the Debtors shall pay a charge of 5% of the amount of the payment due." This clause is misleading because it is titled, "Late Fees" but it refers to the monthly payments as being "delinquent" for more than ten (10) days. The inconsistency lies in the term "Delinquency" [Default due to Delay] ("Morosidad") which is defined in Article I, Section 1.01 as "a delay of thirty (30) days in the monthly payment corresponding to the principal and interest, or principal plus interest. The court finds that specific contractual clauses must be afforded greater weight than general contractual clauses. In the instant case, the Article VIII clause is more specific, and the same must be read together with Article IV, Section 4.01(h), which provides that the Debtor will have ten (10) calendar days to cure any of the situations included in the preceding paragraphs, and for that

-58-

reason, the Bank may not request the effect of default until the ten (10) calendar days have elapsed. Also, the second clause of Article VIII, which is titled, "Additional Late Fees" provides in pertinent part that: "[t]he Debtor acknowledges that this penalty is in addition to the late fees established by the Bank for all payments made after ten (10) days from its due date." This analysis is in conformity with Articles 1236 and 1237 of the PR Code. Article 1236 provides: "[i]f any stipulation of a contract should admit of different meanings, it should be understood in the sense most suitable to give it effect." Article 1237 establishes: "[t]he stipulations of a contract should be interpreted in relation to one another, giving to those that are doubtful the meaning which may appear from the consideration of all of them together." Thus, the court concludes that the creditor BPPR is entitled to the 5% late charge of the monthly payments if the same are made after ten (10) calendar days.

There are two (2) provisions (clauses) in these two (2) loan agreements regarding default interest; these are Article IV, Section 4.01(i) which is in bold and the second clause of Article VIII, which is titled, "Additional Late Fees" ("Cargos Adicional Por Demora"). Section 4.01(i) is in bold and reads as follows: "Interest in the event of default: In the event of default, on behalf of the debtors, under the terms of this contract, starting from the date of sending the notice to the debtors by the Bank or by the holder of the promissory note given as guarantee, the latter shall begin to earn interest on the unpaid balance at the preferred rate (or prime interest rate- Loan 9002) by adding two (2) percentage points to the prime interest rate established in the loan on the date of the notice previously mentioned." The second clause of Article VIII, titled "Additional Late Fees" provides; "In the event of a delinquency [default] ("mora") in the payment of the principal or interest of this obligation, all amounts due shall bear delinquent interest at the rate resulting from adding two (2) percentage points to the interest rate agreed to in this contract from

the **date of default** until full payment of the amounts owed. The Debtor acknowledges that this penalty is in addition to the late fees established by the Bank for all payments made after the (10) days from its due date." Both of these clauses refer to the default interest rate which may be imposed from the date of default, until full payment of the amounts owed is received. The court finds that the provision included in Section 4.01(i) of Article IV regarding the default interest is more specific and requires that in order for the default interest to begin accruing, the Bank must sent notice to the debtor or to the holder of the promissory note in conformity with Section 4.01(i) of Article IV. There is no evidence before the court that would establish that notice of default was given by the creditor to the Debtor. Thus, the default interest rate for these two loans is not applicable to the facts of this case and may not be imposed.

Lastly, the attorney's fees in the amount of $12,539, which are included in the amended proof of claim #5-2 cover both pre-petition (in the amount of $1,550) and post-petition (in the amount of $10,989) attorney's fees. Although BPPR as an oversecured creditor may be entitled to post-petition attorney's fees if the same are provided for by the agreements; the supporting documentation does not allow the court to determine its reasonableness. Therefore, the attorney's fees are not allowed, without prejudice to filing the detail of the same within fourteen (14) days.

Conclusion

Based on the foregoing analysis interpreting certain contractual clauses regarding the late fees and the default interest rate which are included in the three (3) loan agreements in controversy, the court concludes that for all of the three (3) loan agreements the late fee may be applied if the monthly payment(s) is (are) made ten (10) days after the due date. The default interest or additional late fees may not be charged. Therefore, the Debtor's Motion for *Partial Summary Judgment on the Debtor's Objection to Proof of Claim No. 5, Filed By Banco Popular*

*de Puerto Rico* is hereby granted and BPPR's *Motion Requesting Partial Summary Judgment and Memorandum of Law in Support of Summary Judgment* is hereby denied. BPPR shall file an amended proof of claim within fourteen (14) days detailing the amounts owed pursuant to this court's Opinion and Order.

SO ORDERED.

In San Juan, Puerto Rico, this 8th day of June, 2015.

Enrique S. Lamoutte
United States Bankruptcy Judge

-61-